UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

3900 BISCAYNE, LLC,[1]                           Case No. 11-22948-AJC
                                                 Chapter 11

    Debtor.

_____/

## DEBTOR'S DISCLOSURE STATEMENT

3900 Biscayne, LLC, the Debtor under chapter 11 of Title 11 of the United States Code, ("**Debtor**") files its Disclosure Statement ("**Disclosure Statement**") in support of its Plan of Reorganization ("**Plan**" or "**Plan of Reorganization**").

**NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ITS ACCEPTANCE.**

**ALL CREDITORS AND INTEREST HOLDERS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE MADE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE; OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.**

**AFTER THE EFFECTIVE DATE OF THE PLAN, A PORTION OF CERTAIN DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AND INTERESTS ARE CLASSIFIED IN CLASSES THAT CONTAIN CONTESTED CLAIMS OR INTERESTS. ALSO, THERE ARE NO ASSURANCES AS TO THE PERCENTAGE OF DISTRIBUTIONS TO GENERAL UNSECURED CREDITORS WHOSE CLAIMS ARE CLASSIFIED IN CLASSES THAT CONTAIN CONTESTED CLAIMS. THE AMOUNT OF ANY DISTRIBUTION MAY VARY DEPENDING UPON THE TOTAL AMOUNT OF ALLOWED GENERAL UNSECURED CLAIMS.**

---

[1] The Debtor's current mailing address is 2915 Biscayne Blvd., Ste 200, Miami, FL 33137. The last four digits of the Debtor's tax identification number are 5787.

**THIS DISCLOSURE STATEMENT HAS BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. NOTHING CONTAINED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR ON HOLDERS OF CLAIMS OR INTERESTS. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CLAIMS AND CAUSES OF ACTIONS OR THREATENED ACTIONS AGAINST THIRD PARTIES, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.**

**THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS NOT BEEN SUBJECT TO INDEPENDENT REVIEW OR TO CERTIFIED AUDIT. THE DEBTOR HAS MADE EVERY EFFORT TO ENSURE THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE; HOWEVER, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THIS INFORMATION IS WITHOUT ANY INACCURACY.**

## ARTICLE I

## INTRODUCTION AND REPRESENTATIONS

### A.    Introduction and Summary of Plan

The Debtor has prepared and is disseminating this Disclosure Statement to holders of claims against it for the purpose of soliciting acceptance of its Plan of Reorganization. The Debtor believes this Disclosure Statement contains the information that is material, important and necessary for its creditors to arrive at an informed decision in exercising their right to vote for the Plan. A copy of the Plan accompanies this Disclosure Statement as Exhibit "A." For a class of claims to accept the Plan, acceptances must be filed by at least 2/3 in amount and more than 1/2 in number of the Allowed Claims for such claims that actually vote on the Plan. A failure to vote on the Plan does not constitute either an acceptance or rejection of the Plan.

As discussed in greater detail below, the Plan contemplates that the Debtor will continue its efforts to restructure the indebtedness on its assets and continue to operate its business for the benefit of the estate, including equity.

## B.    Representations

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR PASSED UPON BY AN ACCOUNTANT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE DEBTOR'S BEST KNOWLEDGE, INFORMATION AND BELIEF. THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR REJECT THE PLAN.

## C.    Defined Terms

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings. The words or phrases when used in the context of the Plan and Disclosure Statement with initial capital letters shall have definitions set forth in the Plan or as defined herein. Unless otherwise defined, the terms used in this Disclosure Statement shall have the same meaning as in the Bankruptcy Code or Rules.

## D.    Holders of Claims Entitled to Vote

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or equity interests in classes of claims or interests that are impaired under a plan and that will receive distributions under the Plan are entitled to vote to accept or reject the Plan. Under applicable bankruptcy law, any proof of claim filed by an alleged creditor is presumed to be an Allowed Claim until such time as the Debtor (or another party in interest) objects to such a claim. In the event of an objection to a filed claim, **a claimant is not permitted to vote on the Debtor's proposed plan until such time as the claim is temporarily allowed by the Bankruptcy Court for voting purposes. In this regard, the burden is on the claimant to have an objected claim temporarily allowed and the Debtor strongly recommends that parties with claims subject to an objection seek legal counsel to discuss their eligibility to vote.** Classes of claims or interests in which the holders of claims or interests will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan; classes of claims or interests in which the holders of claims or interests are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote on the Plan. Under the Plan Classes 1, 2, 3 and 4 are impaired. Holders of Allowed Claims under one or more of such Classes are entitled to vote on the Plan.

### E.    Cramdown

If all of the applicable requirements of section 1129(a) of the Bankruptcy Code, other than subparagraph 8 thereof, are determined by the Bankruptcy Court to have been satisfied with respect to the Plan, then the Debtor may seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  For purposes of seeking confirmation of the Plan under section 1129(b), the Debtor reserves the right to modify or vary the terms of the Plan or the treatment of the Claims or interests of those Classes that rejected the Plan so as to comply with the requirements of section 1129(b).

## ARTICLE II

## BACKGROUND INFORMATION

### A.    The Debtor and Summary of Reasons for Filing Petition

The Debtor is a Florida limited liability company which owns and leases real property located at 3900 Biscayne Blvd., Miami, Florida 33137 (the "*Property*").  The Property, formerly the studio site for WLBW and most recently WPLG Channel 10, has an estimated value, subject to appraisal, which exceeds the amount of the indebtedness owed to its creditors, including the indebtedness purportedly owed to Branch Banking and Trust Company ("*BB&T*"), as set forth in more detail below.

The Property was originally acquired by the Debtor in 2007 for a proposed residential re-development project.  Unfortunately, shortly thereafter, the Debtor found itself in the middle of one of the worst, if not the worst, real estate markets in South Florida history.  As the intended re-development of the Property was no longer feasible, the Debtor, through its diligent efforts and hard work, managed to salvage the situation by entering into a lease for space at the Property with Miami Arts, Inc., d/b/a Miami Arts Charter School (the "*Tenant*"), which generates significant rental income for the Debtor. In fact, in order to secure the Tenant, the Debtor's members invested and loaned in excess of $1,200,000 to improve, renovate and reconfigure the space in the Property to meet the Tenant's needs and requirements. Pursuant to that certain Lease Agreement dated June 1, 2009 (the "*Lease Agreement*"), the Tenant pays monthly rent of $66,250, which increases to $70,416.66 as of August 2011, with additional increases over the life of the lease ("*Rental Income*"). The Lease Agreement commenced on July 24, 2009 and expires on July 31, 2014, or on such earlier date as the Lease is terminated per its terms.  However, there is an automatic extension option for an additional five year term upon written notice. As a result of the Lease Agreement, the Debtor has recurring, consistent Rental Income from the Tenant which will be used to fund the Plan.

The Tenant, Miami Arts Charter Schools, is a tuition-free public charter school offering a rigorous college-preparatory academic curriculum and conservatory-style training in the visual and performing arts.  The schools were founded by veteran public school music teachers Alfredo and Christine de la Rosa.

Miami Arts Charter Schools:

• Serve up to 1,300 culturally and socioeconomically diverse students from communities across Miami-Dade County spanning from grade kindergarten through 12th grade.

• Place students into their appropriate achievement levels within one of its major arts departments: Dance, Music (Instrumental or Vocal), Creative Writing and Visual Arts. (Additional coursework is offered in theater and photography).

• Draw its distinguished arts and academic faculty from Miami's rich and thriving creative community and through national searches for outstanding teachers. They select instructors who are working professionals that provide high-quality training combined with real-world experience.

• Offer an academic program that meets all high school graduation and university entrance requirements.

• Are a model small learning community located in Miami's Design District and offer direct connections with visiting staff from the University of Miami.

The Debtor filed this Chapter 11 proceeding in order to restructure the indebtedness on the Property and reorganize for the benefit of the estate, including equity. The Debtor believes that there is sufficient equity in the Property and Rental Income to pay debt service to BB&T at a market rate of interest for a market term, and to pay all creditors in full over a reasonable period of time.

## B.    Prepetition Litigation with Branch Banking and Trust Company

### The Foreclosure Action

Prior to the filing of this bankruptcy case, the Debtor was named as a co-defendant in the litigation styled *Branch Banking and Trust Company v. 3900 Biscayne, LLC., et al.*, Case No. 10-23279-CV-JORDAN/McALILEY currently pending in the United States District Court for the Southern District of Florida (the *"Foreclosure Action"*).

### *History of the Dispute*

The Debtor negotiated the loan at issue with Colonial Bank, N.A. (*"Colonial Bank"*) in 2007. The Debtor had a beneficial working relationship with Colonial Bank until Colonial Bank was taken over by the FDIC in August 2009. At that point, BB&T allegedly acquired the loan pursuant to a loss-share agreement between BB&T and the FDIC. In contrast to the constructive nature of the relationship between the Debtor and Colonial Bank, BB&T has proven uncooperative with respect to restructuring the loan, and to date, BB&T has demonstrated an unwillingness to amicably resolve this matter. Notwithstanding, the Debtor has sufficient cash flow from the Rental Income to service the loan on terms that will provide adequate protection to BB&T, and pay all of the Debtor's creditors.

***Claims Asserted by BB&T in the Amended Complaint and Debtor's Answer (A Note)***

On December 16, 2010, BB&T filed its Amended Complaint (the "***Amended Complaint***") in the Foreclosure Action seeking: (i) monetary damages against the Debtor based on the Debtor's alleged default of a promissory note in the original principal amount of $10,800,000 (the "***A Note***"); (ii) monetary damages against fellow defendants Nancy Karp, Kobi Karp; Deborah Flacks and Michael Flacks as guarantors of the subject loans; (iii) foreclosure of the mortgage on the Property and (iv) turnover of pledged rents.

As is set forth in the Debtor's Answer and Affirmative Defenses (the "***Answer***") filed in the Foreclosure Action on January 31, 2011, and as more fully described below, the Note is not in default and the lawsuit should never have been initiated in light of the fact that BB&T agreed to modify the loan at issue. Moreover, BB&T failed to provide proof with its Amended Complaint that BB&T is the assignee of, or successor to, Colonial Bank's rights, title and interest in the subject loan.

### *Specific Allegations of Default and Debtor's Response*

In its Amended Complaint, BB&T alleges that the Debtor defaulted on the Note by, without limitation (a) failing to make payment of the debt outstanding at maturity; and (b) failing to pay property taxes on the Property.

The Debtor asserts that the allegations are without merit for the following reasons:

First, the Debtor was not required to make a payment of the debt outstanding at maturity because the Note did not mature. BB&T made various representations, both written and oral, and took or refrained from taking various actions, which implicitly and explicitly confirm BB&T's offer to extend and modify the Note which was accepted by the Debtor. Significantly, BB&T accepted payment on the Note subsequent to its alleged maturity, without objection, prior to wrongfully placing the Debtor in default thereunder.

The Debtor justifiably relied on BB&T's representations that the Note would be modified and extended, as BB&T expected or reasonably should have expected. The Debtor made significant and detrimental business decisions based on the reasonable belief that funds would be available under the modified Note. Specifically, BB&T promoted and approved the Debtor's entering into a lease with a tenant for the Property which BB&T knew would render the Debtor unable to service the debt evidenced by the Note without modification and extension. Moreover, BB&T knew that the aforementioned lease required the Debtor to expend significant funds on a build out for the Tenant and that the lease would not generate sufficient revenue to service the debt evidenced by the Note absent modification and extension.

Critically, BB&T's modification offer was confirmed in a letter from Michelle Walker of BB&T to Congressman Kendrick Meek and to the FDIC regarding this loan. The Debtor was harmed by BB&T's failure to honor its commitment to modify and extend the Note.

Second, the Debtor was not in default on the Note because of a failure to pay the property taxes on the Property for the tax year 2009. This is because the Debtor was, and has been, in the process of successfully appealing its liability for such taxes. In fact on May 26, 2011, the Miami-Dade Tax Collector advised the Debtor that it had reduced the 2009 tax amount from $240,741.34 to $175,532.28, with a further discount to $168,510.98 if paid by June 26, 2011.

As is set forth in the Debtor's Answer and Affirmative Defenses (the "***Answer***") filed in the Foreclosure Action on January 31, 2011, the Note is not in default and the lawsuit should never have been initiated in light of the fact that BB&T agreed to modify the loan at issue. Moreover, BB&T may lack standing to even pursue the Foreclosure Action, as it failed to provide proof with its Amended Complaint, that BB&T is the assignee of, or successor to, Colonial Bank's rights, title and interest in the loan.

## The B Note Action

### *Claims Asserted By BB&T in the B Note Complaint and Debtor's Answer*

On December 20, 2010, BB&T filed its Amended Complaint (the "***B Note Complaint***") against the Debtor and others in a lawsuit related to the Foreclosure Action styled *Branch Banking and Trust Company v. 3900 Biscayne, LLC., et al.*, Case No. 10-23297-CV-JORDAN/McALILEY currently pending in the United States District Court for the Southern District of Florida (the "***B Note Action***"). Pursuant to the B Note Complaint, BB&T seeks (i) monetary damages against the Debtor based on the Debtor's alleged default of a promissory note in the original principal amount of $675,000 (the "***B Note***") and (ii) monetary damages against co-defendants Nancy Karp, Kobi Karp, Deborah Flacks and Michael Flacks as guarantors of the subject loan. The B Note Complaint seeks further relief against the other non-debtor defendants based on theories of (i) declaratory relief; foreclosure of pledge agreement; (ii) specific performance; (iii) constructive trust/ equitable lien and (iv) negligent misrepresentation, and seeks to recover various certificates of deposit allegedly pledged as collateral for the B Note by third parties, which is disputed by those third parties. These certificates of deposit are not assets of the Debtor, and the B Note is not secured by the Debtor's assets, including the Property.

As is set forth in the Debtor's Answer to the B Note Complaint, and similar to the Foreclosure Action, the allegations in the B Note Complaint are without merit. Specifically, the Debtor did not default on the B Note where, among other things: (i) the B Note did not mature due to BB&T's representations to extend and modify the B Note; and (ii) the Debtor continued to make payments on the B Note beyond the time at which BB&T claims the B Note matured, and BB&T accepted said payments without objection prior to wrongfully placing the Debtor in default. Further, BB&T has failed to allege any facts to establish it has a perfected security interest in the collateral pledged by third parties which is fatal to its claim.

**C.    Prepetition Settlement with the Comras Company of Florida, Inc.**

On February 16, 2010, The Comras Company of Florida, Inc. ("*Comras*") initiated litigation against the Debtor in a case styled *The Comras Company of Florida, Inc. v. 3900 Biscayne, LLC, et al.*, Case no. 10-15067 CA 15. In its complaint, Comras asserts claims for monetary damages based on the Debtor's alleged failure to fully pay commissions due to Comras pursuant to a brokerage agreement between Comras and the Debtor dated June 8, 2008. The Debtor denied liability to Comras based on the claims as alleged. On January 18, 2011, the Court entered its Agreed Order Approving Settlement Agreement and Order of Dismissal. The confidential settlement provides for monthly payments to Comras of $7,500 over 24 months and other agreed upon contingent amounts. As of the Petition Date, Comras was due $138,500 under the settlement.

**D.    Prepetition Settlement with Post-Newsweek Stations Florida, Inc.**

On December 22, 2006, the Debtor and Post-Newsweek Stations Florida, Inc. ("*Post-Newsweek*") entered into that certain Purchase and Sale Contract (the "*PSC*"), pursuant to which the Debtor agreed to lease back the Property to Post-Newsweek for two years. The lease term was extended another two years (to June 30, 2009) pursuant to that certain Addendum to Commercial Lease dated July 2, 2007.

Pursuant to the terms of the PSC, with respect to certain groundwater contamination at the Property, Post-Newsweek agreed to undertake the remediation required by the Department of Environmental Resources Management ("*DERM*") which was set forth with specificity in paragraph three of the Fifth Amendment to the PSC dated March 28, 2007 (the "*DERM Obligations*"). As a result of certain disputes arising between the Debtor and Post-Newsweek, including, without limitation, disputes regarding the condition of the Property and the DERM Obligations, the Debtor initiated litigation against Newsweek in a five-count complaint for damages in the case styled *3900 Biscayne, LLC v. Post-Newsweek Stations Florida, Inc.*, Case No.: 10-10517-CA-23 (the "*Post-Newsweek Action*"). In response, Post-Newsweek asserted certain affirmative defenses denying the claims for damages and asserted a two-count counterclaim for money owed and unjust enrichment (the "*Counterclaim*"). The Debtor responded to the Counterclaim by asserting certain affirmative defenses denying any money was owed to Post-Newsweek.

Prior to the completion of any discovery or proceeding with any dispositive motions in the Post-Newsweek Action, the parties, without admitting or conceding liability, entered into a confidential settlement agreement on or about December 22, 2010. The settlement agreement provided for the Debtor to receive certain settlement proceeds (which have been paid in full). Notwithstanding, the Property has not been fully remediated from contamination, and to the extent it remains unremediated, the Debtor has a claim against the prior owner of the Property for any unremediated environmental contamination.

E.    **Prepetition Settlement Between Nancy Karp, Kobi Karp (the "*Karp Parties*"), Michael Flacks and Deborah Flacks (the "*Flacks*"), the Henry Bouskela Living Trust ("*HBLT*") and Henry Bouskela Regarding Transfer of Membership Interests in the Debtor.**

On or about January 2007, Nancy Karp, Deborah Flacks ("*DF*") and the Henry Bouskela Living Trust ("*HBLT*") entered into that certain Operating Agreement for the Debtor pursuant to which Nancy Karp, DF and HBLT each held a 33.33% interest in the Debtor.    On or about September 30, 2009 DF's 33.33% interest in the Debtor was transferred to Michael Flacks ("*MF*," together with DF, the "*Flacks*") pursuant to the terms of that certain Unanimous Consent and Executed Resolution by Members (the "*Resolution*"). Simultaneously with the execution of the Resolution, the Flacks jointly and severally executed that certain promissory note on the original principal sum of $133,000 by agreeing to pay Nancy Karp, as holder, pursuant to the terms and conditions of the note (the "*Flacks Note*").

Disputes arose between the parties related to the Flacks Note, the Resolution, the Property and the lawsuits filed against Nancy Karp and the Flacks, among others (including the Debtor) by BB&T in the Foreclosure Action and the B Note Action.

On January 20, 2011, without any party admitting or conceding liability, Nancy Karp, the Flacks and certain other related parties entered into a confidential settlement (the "*Flacks Settlement*"). Among other things, the Flacks Settlement provides for the assumption by Nancy Karp of the membership interest of the Flacks in the Debtor and the cancellation of the Flacks' obligations pursuant to the Flacks Note.

F.    **Prepetition Claim of Kobi Karp Architecture & Interior Design**

Prepetition, Kobi Karp Architecture & Interior Design ("*KKAID*") performed architectural services on behalf of the Debtor to improve and ready the Property for occupancy by the Tenant and has a scheduled general unsecured claim in the amount of $1,054,315.40. Kobi Karp is Nancy Karp's spouse.  Nancy Karp does not have any ownership interest in KKAID.  Kobi Karp does not have any ownership interest in the Debtor.  KKAID is neither an insider nor an affiliate of the Debtor.  Accordingly, KKAID's claim is not an insider claim.

G.    **Prepetition Insider Claim of Nancy Karp**

Nancy Karp is the managing member of the Debtor and an insider.  Prepetition, she loaned money to the Debtor and she has a scheduled general unsecured claim in the amount of $823,000.  Nancy Karp's claim is an insider claim.

## ARTICLE III

### THE BANKRUPTCY CASE

On May 12, 2011 ("***Petition Date***"), the Debtor filed a Voluntary Petition for relief under chapter 11 of the United States Bankruptcy Code [ECF No. 1]. The Debtor continues to manage and operate its business as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been sought or appointed.

On May 17, 2011, the Debtor filed its Case Management Summary [ECF No. 9].

On June 15, 2011, the Debtor filed its application to employ Peter D. Russin, Esquire, and the law firm of Meland Russin & Budwick, P.A. ("***MRB***") as its Bankruptcy Counsel [ECF No. 34], which is set for hearing on June 22, 2011.

On June 17, 2011, the Debtor also filed its application to employ Sanford D. Horwitz, CPA and Goldstein Schechter Koch as its Accountant [ECF No. 43], which remains pending.

The 341 Meeting of Creditors is scheduled for June 21, 2011 at 2:00 p.m. [ECF No. 7].

The Debtor's bankruptcy case is a single asset real estate case. The Debtor's initial deadline to comply with 11 U.S.C. §362(d)(3) is August 10, 2011.

### BB&T's Motion to Dismiss

On May 17, 2011, BB&T filed its Motion to Dismiss Chapter 11 Bankruptcy Case [ECF No. 12], which was originally set for hearing on June 22, 2011.

On June 16, 2011, BB&T filed its Agreed *Ex Parte* Motion to Continue Hearing on its Motion to Dismiss Chapter 11 Bankruptcy Case [ECF No. 39]. On June 17, 2011, the Court entered its Order Granting Agreed *Ex Parte* Motion to Continue Hearing Scheduled for June 22, 2011 on BB&T's Motion to Dismiss Chapter 11 Bankruptcy Case [ECF No. 48], scheduling the hearing for July 28, 2011 at 11:30 a.m.

### BB&T's Motion for Relief from Automatic Stay

On May 17, 2011, BB&T filed its Motion for Relief from Automatic Stay or in the Alternative Motion for Adequate Protection [ECF No. 11, which was re-docketed as ECF No. 18] on negative notice. On May 31, 2011, the Debtor filed the Agreed Ex Parte Motion for Extension of Time to Respond to Motion for Relief From Automatic Stay [ECF No. 27] and on June 3, 2011, the Court entered the Order Granting Agreed Ex Parte Motion for Extension of Time to Respond to Motion for Relief From Automatic Stay [ECF No. 30] extending Debtor's deadline to file a response to June 17, 2011. On June 17, 2011, the Debtor filed its response. The matter remains pending.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

### A.    Claims Bar Date

On May 13, 2011, the Bankruptcy Court set a deadline requiring anyone holding or asserting a claim against the Debtor to file a proof of claim on or before September 19, 2011 (the "*Claims Bar Date*") [ECF No. 7].

### B.    The Use of Cash Collateral

On May 17, 2011, BB&T filed its Motion to Prohibit Use of Cash Collateral in the Form of Rents from Mortgage Property or in the Alternative Motion for Adequate Protection [ECF No. 10, re-docketed as ECF No. 17], which is set for hearing on June 22, 2011.

On June 15, 2011, the Debtor filed its Motion Pursuant to 11 U.S.C. §§ 361, 362, 363 and 552 and Fed. R. Bankr. P. 4001, 6003 and 9014, for an Order Authorizing the Use of Cash Collateral and Granting Adequate Protection [ECF No. 35] (*"Motion for Cash Collateral"*).

**The Debtor affirms that it is not, and has not since the commencement of this case, been using the cash collateral of BB&T, and will not do so unless consent is given by BB&T or by order of this Court.**

The Debtor intends to use the cash collateral consisting of the Rental Income to fund its current operational needs, such as payment for building management, accounting fees, and operating/repair/maintenance fees. The Debtor also intends to use the cash collateral to make a one-time payment for the Phase II Tenant Build-Out under the lease.

In addition, the Debtor seeks to use cash collateral consisting of the Rental Income to pay monthly Note rate interest payments to BB&T at the current Note rate of 2.49% in the amount of approximately $22,400 (which varies slightly per month between approximately $22,400 and $23,150 as per the Budget), as further adequate protection as set forth in the Budget attached to the Debtor's Motion for Cash Collateral.

### C.    DIP Reports

For financial reporting purposes, a Chapter 11 Debtor-in-Possession ("*DIP*") is a different entity from that which existed prior to the commencement of the bankruptcy. The financial report required by the United States Trustee to be submitted by all Chapter 11 DIPs is designed to reflect changes in the financial position of a DIP during the pendency of a Chapter 11 case and includes a statement of all receipts and disbursements, and payments (including wage withholding, unemployment and social security taxes) to employees, and such other information as is required by the United States Trustee. Each report is a sworn statement by the respective DIP and must be as accurate as possible. The Debtor will file its Debtor-In-Possession Monthly Operating Reports as required and will be otherwise available for review by parties in interest.

**D.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Debtor intends to file a motion to assume the Lease Agreement. All other executory contracts and unexpired leases which have not been specifically assumed or rejected shall be deemed rejected pursuant to the terms set forth in this Disclosure Statement and the Plan.

**E.      Debtor's Exclusivity**

The Debtor's exclusive period to file its plan expires on September 9, 2011, and the deadline for the Debtor to solicit acceptances of the Plan is November 8, 2011. The Debtor's Plan and Disclosure Statement have been filed within its exclusive period.

## ARTICLE IV

## CHAPTER 11 PLAN

THE FOLLOWING IS A SUMMARY OF THE PLAN. THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "A." IF THERE IS ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. THIS SUMMARY ONLY HIGHLIGHTS SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, CREATE A THOROUGH UNDERSTANDING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING ON THE DEBTOR AND ALL HOLDERS OF CLAIMS AND INTERESTS

**A.      Treatment of Administrative Claims and Operating Expenses**

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims against the Debtor and ordinary course operating expenses will not be classified for purposes of voting or receiving distributions under the Plan. All such Claims and operating expenses will be treated separately as unclassified Claims and obligations on the terms set forth in this Article IV.

**B.      Treatment of Administrative Claims**

**1.      Time for filing Administrative Claims:** Failure to timely file and Administrative Claim, at a time and date set by the Court, will result in such claim being forever barred and discharged unless otherwise ordered by the Court.

**2.      Time for Filing Professional Fee Claims:** Each person who holds or asserts a Professional Fee Claim must file with the Court, at a time and date set by the Court, and serve on all parties required to receive notice a final Fee Application. The failure to timely file a final Fee Application will result in the Professional Fee Claim being forever barred and discharged unless otherwise ordered by the Court.

**3.      Allowance of Administrative Claims:**    An Administrative Claim properly filed will become an Allowed Administrative Claim if no objection is filed and the same is approved by the Court.  If an objection is timely filed, the Administrative Claim will become an Allowed Administrative Claim only to the extent allowed by an order or judgment of the Court, which order or judgment becomes a Final Order.  An Administrative Claim that is a Professional Fee Claim will become an Allowed Administrative Claim only after and to the extent that (i) a final Fee Application is properly filed, and (ii) a Final Order allowing such Professional Fee Claim is entered by the Court.

### C.      Classification of Claims and Interests

#### 1.      Summary of Classes and Classification

The categories of Claims and Interests listed below classify Claims (except for Administrative Claims and Operating Expenses) and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan.  The claims against the Debtor shall be classified as specified below.  Consistent with Section 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and is classified in a different Class, to the extent the Claim or the Interest is within the description of that different class.

### CLASSES AND CLASSIFICATION

Class 1    Secured Claim of Miami Dade County Tax Collector
Class 2    Secured Claim of BB&T
Class 3    Unsecured Claim of BB&T
Class 4    General Unsecured Claims
Class 5    Equity

### D.      Treatment of Classified Claims and Interests in the Plan

#### 1.      Administrative Claims of the Debtors

**a)      Professional fees:**  The Debtor employed, or will seek to employ, with Court approval, the following professionals who may be filing interim and final fee applications (unless otherwise indicated):

- Peter D. Russin, Esquire and the law firm of Meland Russin & Budwick, P.A. ("***MRB***"), as the Debtor's counsel.
- Sandy Horwitz, CPA and the accounting firm of Goldstein Shechter Koch as the Debtor's accountant.

At this time the Debtor does not know the amount of attorneys' fees and costs that will ultimately be sought by the Debtor's attorneys, MRB or its accountant.  In addition to any allowed interim payments, the attorneys' fees and costs and other professional fees shall be paid

in full on the Effective Date of the Plan or as otherwise agreed between the Debtor and each administrative claimant. The proposed Cash Collateral Order submitted to the Court but not yet entered provides that "[t]he administrative priority for the 507(b) Claim granted hereunder shall be subordinate only to (i) fees payable pursuant to 28 U.S.C. §1930(a)(6); and (ii) the payment of accrued and unpaid professional fees and expenses allowed by the Court of the Debtor's counsel, Meland Russin & Budwick, P.A., after first applying any prepetition retainer received, awarded by the Court." The Debtor reserves the right to seek to retain additional professionals, if required.

### 2. United States Trustee Fees

The Debtor shall pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the Effective Date, for pre-confirmation periods. The Debtor shall further pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Debtor, respectively, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code. After the Confirmation Date, the Debtor shall file a quarterly Post-Confirmation Operating Report which shall include, among other things, all payments made under the Plan and payments made in the ordinary course of business. The Post-Confirmation Operating Report shall be filed quarterly until the Court enters a Final Decree, dismisses the case, or converts the case to another chapter in bankruptcy.

### 3. Approval of Administrative Claims

All Administrative Claims are subject to allowance by the Bankruptcy Court and its determination of the reasonableness of the amounts. Any party in interest can object to any claim for administrative fees and expenses.

### 4. Payment of Allowed Administrative Claims

The holders of Allowed Administrative Claims shall receive, on account of such claims, cash in the amount of such claims (i) on the later of the Effective date or within ten (10) days any such claims are determined to be Allowed or (ii) at the option of the Debtor, in accordance with the ordinary business terms of payment of such claims. Professionals employed at the expense of the estate of the Debtor and entities who may be entitled to reimbursement for the allowance of fees and expenses from the estate of the Debtor pursuant to §503(b) of the Bankruptcy Code, shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with the final order entered pursuant to §330 or §503 of the Bankruptcy Code.

## The Debtor's Classes of Creditors

**A.    Allowed Secured Claim of Miami-Dade County Tax Collector (Class 1):**

Class 1 consists of the Allowed Secured Claim of The Miami-Dade County Tax Collector (the *"MDCTC"*), plus statutory interest, for unpaid real property taxes for 2009 (the *"MDCTC Claim"*). MDCTC filed Claim No. 1 in the amount of $240,741.34, plus 18% statutory interest. The MDCTC Claim has been successfully appealed by the Debtor and has been reduced to $175,532.28, and as set forth in a letter from the MDCTC dated May 26, 2011, attached as Exhibit "B", is further discounted to $168,510.98 if paid in full by June 26, 2011.  That discounted payoff amount is no longer available after June 26, 2011, after which the taxes owed will increase at the statutory rate of 18% per annum dating back from April 2010 until they are paid. In order to obtain those savings for the benefit of the estate and its creditors, the Debtor filed Debtor's Emergency Motion for Order Authorizing Debtor to Pay Prepetition Property Taxes for 2009 Tax Year [ECF No. 44], which remains pending.  If the approval to pay the discounted amount by June 26, 2011 is granted, the MDCTC claim shall be paid in full and will not constitute a claim in this case.  In the event approval is denied, the MDCTC's Class 1 Claim will remain and will be paid within five (5) years of the 2009 assessment date.  In that event, MDCTC's Class 1 Claim is impaired under the Plan.

**B.    Allowed Secured Claim of BB&T (Class 2):**

Class 2 consists of the Allowed Secured Claim of BB&T, to be determined by a final, non-appealable order in this Bankruptcy Proceeding or an Adversary Proceeding. BB&T's Class 2 Claim, arising out of the A Note, and as evidenced by the May 12, 2011 monthly statement provided by BB&T, attached as Exhibit "C", consists of principal in the amount of $10,800,000, note rate interest at 2.49%, and to the extent applicable, late charges and fees, for a total amount of $11,029,286[3]. Once the amount of BB&T's allowed secured claim has been determined, BB&T shall be paid in full, including note rate interest as calculated by the "Two Year-Swap Rate", which shall mean the International Swaps and Derivatives Associates (*"ISDA"*) 2-year mid-market per swap rate, which is a rate for a Fixed Rate Payer in return for receiving three (3) month's LIBOR, plus a margin of 2.06%, as set forth in the A Note, with a 25 year amortization and a 4 year balloon in accordance with and as set forth in the projections attached as Exhibit "D". The Note A Loan Documents, including all of the terms and conditions contained therein, to the extent not expressly modified herein, are adopted in full by the Debtor and the Reorganized Debtor, and shall remain in full force and effect.  BB&T shall retain a lien securing its Allowed Class 2 Claim until such Allowed Class 2 Claim is paid in full.  To the extent that the Debtor's Rental Income and the proceeds from the Third Party Litigation Claims are insufficient to pay the Allowed Class 2 Claim, any deficiency shall be treated as an Allowed Class 3 Claim, pursuant to the terms set forth in the Plan. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 2 Claim.  Class 2 is impaired under the Plan.

---

[3] This amount is calculated through an anticipated Confirmation date of September 12, 2011, by using the amount listed on the May 12, 2011 statement provided by BB&T, adding post-petition per diem interest, and subtracting the anticipated adequate protection payments.

### C.    Allowed BB&T General Unsecured Claim (Class 3):

Class 3 consists of the Allowed BB&T General Unsecured Claim, to be determined by a final, non-appealable order in this Bankruptcy Proceeding or an Adversary Proceeding. This Class 3 Claim arises out of the B Note in the original principal amount of $675,000, and a remaining balance, including fees and costs, of $634,880.96[4], and is disputed by the Debtor. BB&T is also seeking to recover on the B Note from non-debtor defendants and from several certificates of deposits allegedly pledged as collateral for the B Note by third parties, Nancy Karp and Tania Buskela, which these third parties dispute. Once the amount of the Class 3 Claim is determined, and to the extent a claim remains, BB&T's Class 3 Claim shall be paid in full, including note rate interest as calculated by the "Two Year-Swap Rate", which shall mean the International Swaps and Derivatives Associates (*"ISDA"*) 2-year mid-market per swap rate, which is a rate for a Fixed Rate Payer in return for receiving three (3) month's LIBOR, plus a margin of 2.06%, as set forth in the B Note, with a 25 year amortization and a 4 year balloon in accordance with and as set forth in the projections attached as Exhibit "D". The Note B Loan Documents, including all of the terms and conditions contained therein, to the extent not expressly modified herein, are adopted in full by the Debtor and the Reorganized Debtor and shall remain in full force and effect. The Allowed Class 3 Claim shall only be paid after the Allowed Class 2 Claim has been paid in full. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 3 Claim. Class 3 is impaired under the Plan.

### D.    Allowed General Unsecured Claims (Class 4):

Class 4 consists of all of the Allowed General Unsecured Claims. All holders of Allowed General Unsecured Claims shall be paid from the Debtor's Rental Income and the proceeds of any Third Party Litigation Claims, in full, within 4 years from the Effective Date, simultaneous with Allowed Class 2 and 3 Claims, at 2.49% interest at a two (2) year amortization, except for KKAID, which has agreed to accept payments beginning April 2014. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 4 Claims. Class 4 Claims are impaired.

### E.    Equity Interests (Class 5):

Class 5 consists of all holders of allowed equity interests in the Debtor. All Class 5 Equity Interests shall revest in the Reorganized Debtor on the Effective Date. The holders of allowed equity interests shall retain their equity interests, including for the purpose of governing the Reorganized Debtor.

---

[4] This amount is calculated through an anticipated Confirmation date of September 12, 2011, by adding post-petition per diem interest, and subtracting the anticipated adequate protection payments.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

## ARTICLE V

## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    Source and Application of Funds Upon Confirmation

The Plan is a plan of reorganization. The Debtor's principal sources of revenue are comprised of the Debtor's Rental Income and the proceeds of any Third Party Litigation Claims. Prior to the Effective Date, the Debtor, and following the Effective Date, the Reorganized Debtor shall (i) continue to collect its Rental Income and operate the Property, and (ii) shall prosecute the Third Party Litigation claims, if any.

### B.    Prosecution of Third Party Litigation Claims

As stated above, the Debtor's Plan will also be implemented through the prosecution of claims against third parties, if any. On the Effective Date, the Reorganized Debtor shall be authorized, except as provided for in the Plan, to commence and prosecute any and all Third Party Litigation Claims that arose before, on or after the Petition Date. Proceeds, if any, realized from any Third Party Litigation Claims shall be added to the Rental Income used to fund the Plan. The Debtor has a claim against Post-Newsweek, the prior owner of the Property, pursuant to the PSC and the settlement agreement between the Debtor and Post-Newsweek, for any unremediated environmental contamination and damage.

In addition, within ninety (90) days prior to the Petition Date, the Debtor made payments to creditors and other parties. A list of payments to Debtor's creditors within ninety days prior to the Petition Date is included in the Debtor's Statement of Financial Affairs. Many of the recipients of payments may have defenses to the Estate's causes of action and/or the pursuit of such claims may not be economically feasible due to the amount of the payments at issue. The Debtor is continuing its investigation of any and all Third Party Litigation Claims, including but not limited to preference claims, avoidance actions, and insider claims under bankruptcy law, which the Debtor may have against third parties, and specifically reserves all such claims.

### C.    Revesting of Assets

Except as otherwise provided in the Plan or Confirmation Order, title to all of the Debtor's Assets will revest in the Reorganized Debtor, free and clear of all claims and interests on the Effective Date. After the Effective Date the Reorganized Debtor may operate its respective property and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or Confirmation Order. As of the Effective Date, the Debtor's Estate will be free and clear of all claims and interest except as otherwise provided in the Plan or the Confirmation Order.

### D.    Post-Confirmation Operations

Following Confirmation, the Reorganized Debtor shall execute such documents and take such other actions as are necessary to make effective the transactions provided for in the Plan.

**E.     Post-Confirmation Accounts**

The Debtor may establish one or more interest-bearing accounts as it determines may be necessary or appropriate to effectuate the provisions of the Plan consistent with the section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court.

**F.     Closing of the Chapter 11 Case**

Notwithstanding anything to the contrary in the Bankruptcy Rules or Local Rules providing for earlier closure of the chapter 11 case, when all Contested Claims against the Debtor have become Allowed Claims or Disallowed Claims, and all remaining Assets of the Debtor have been liquidated and converted into Available Cash (other than those Assets abandoned by the Debtor), and such Available Cash has been distributed in accordance with the Plan, or at such earlier time as the Reorganized Debtor deems appropriate, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     Rejection of Executory Contracts and Unexpired Leases; Exceptions**

EXCEPT FOR THOSE EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT WILL BE THE SUBJECT OF MOTION(S) TO ASSUME OR REJECT TO BE FILED ON OR BEFORE THE DATE OF THE CONFIRMATION HEARING, ALL EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTOR WILL BE REJECTED PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE ON THE EFFECTIVE DATE.

**B.     Approval of Rejection; Rejection Damages Claims Bar Date**

The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejections of all the Debtor's executory contracts and unexpired leases that have not been assumed by the Debtor pursuant to Court Order. Any Claim for damages arising from any such rejection must be filed within 30 days from the date of service of the Confirmation Order or such Rejection Claim shall be forever barred, shall not be enforceable against the Debtor, its estate or any of their respective properties and shall receive no distribution under the Plan or otherwise on account of such Rejection Claim. **TO REITERATE, THE FAILURE TO TIMELY FILE EXECUTORY CONTRACT REJECTION CLAIMS SHALL BAR SUCH CLAIMS AND THE HOLDERS THEREOF SHALL NOT BE ENTITLED TO ANY DISTRIBUTIONS UNDER THE PLAN.**

**C.      Treatment Under the Plan of Executory Contract Rejection Claims**

Unless otherwise ordered by the Bankruptcy Court, an Allowed Executory Contract Rejection Claim shall be treated as an Allowed General Unsecured Claim (i.e., Allowed Class 4) under the Plan.

**D.      Section 1146 Exemption**

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the execution, delivery or recording of an instrument of transfer made after the Plan is confirmed, or the transfer or sale of any real, personal or other Property by the Debtor, Trustee, or Reorganized Debtor made after the Plan is confirmed, shall be considered a transfer made after confirmation of the Plan and shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

The execution, delivery or recording of an instrument of transfer made prior to the confirmation of the Plan, or the transfer or sale of any real, personal or other Property by the Debtor or Trustee made prior to confirmation of the Plan, shall be subject to all applicable transfer taxes.

## ARTICLE VII

## TAX CONSEQUENCES

### CERTAIN UNITED STATES FEDERAL
### INCOME TAX CONSIDERATIONS OF THE PLAN

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, CLAIMHOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY CLAIMHOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON CLAIMHOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) CLAIMHOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain material US federal income tax consequences of the Plan is provided herewith. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist

with respect to various tax consequences of the Plan as discussed herein. Only the principal consequences of the Plan for holders of Claims who are entitled to vote to accept or reject the Plan are described below. No opinion has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of US federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended, the Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the US federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims who are (or who hold their Claims through) pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale (or conversion transaction). The following discussion assumes that holders of Claims hold their Claims as capital assets for United States federal income tax purposes. Furthermore, the following discussion does not address US federal taxes other than income taxes.

For purposes of the following discussion, a "US person" is any of the following:

- an individual who is a citizen or resident of the US;
- a corporation created or organized under the laws of the US or any state or political subdivision thereof;
- an estate, the income of which is subject to federal income taxation regardless of its source; or
- a trust that (a) is subject to the primary supervision of a US court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable US Treasury regulations to be treated as a US person.

As used herein, the term "U.S. Holder" means a Claimholder that is a United States person, the term "non-U.S. person" means a person other than a United States person and the term "Non-U.S. Holder" means a Claimholder that is a non-U.S. person.

**Each holder of a Claim is strongly urged to consult its own tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

### Certain United States Federal Income Tax Consequences to Holders of Claims

Generally, these consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) the holder's method of tax accounting; (4) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior years; and (5) (a) whether the Claim was acquired at a discount, (b) whether the Claimholder has previously included accrued but unpaid interest with respect to the Claim, (c) whether the Claim is an installment obligation for US federal income tax purposes and (d) whether the Claim constitutes a "security" for US federal income tax purposes. Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

### Allocation of Plan Distributions Between Principal and Interest

The Plan provides that, to the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for US federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. The Reorganized Debtor intends to take the position that any distributions made under the Plan with respect to an Allowed Claim will be allocated first to the principal amount of the Claim, with the excess over the principal amount being allocated to accrued but unpaid interest. However, current US federal income tax law is unclear on this point and no assurance can be given that the IRS will not challenge the Company's position.

### Information Reporting and Backup Withholding

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, are generally subject to information reporting by the payor (here, the Disbursing Agent) to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRS's backup withholding rules, a Claimholder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (2) provides a correct US taxpayer identification number and makes certain certifications under penalties of perjury. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Claimholder's US federal income tax liability, and such Claimholder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a US federal income tax return).

**Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE US FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## ARTICLE VIII

## LIQUIDATION ALTERNATIVE

As with any Plan, an alternative would be conversion of the chapter 11 case to a chapter 7 case and subsequent liquidation of the Debtor by a duly appointed or elected chapter 7 trustee. In the event of a liquidation under chapter 7 the following is likely to occur:

(1) An additional tier of administrative expenses entitled to priority over general unsecured claims under § 507(1) of the Bankruptcy Code would be incurred. Such administrative expenses would include chapter 7 Trustee's commissions and fees to the chapter 7 Trustee's accountants, attorneys and other professionals likely to be retained by him/her for the purpose of liquidating the assets of the Debtor;

(2) Substantially less than market value will be realized for the Debtor's assets;

(3) Further claims would be asserted against the Debtor with respect to such matters as income and other taxes associated with the sale of the assets;

The Debtor estimates its Creditors would receive less of a distribution in the event of a liquidation of the Debtor's assets by means other than that provided for in the Plan. Therefore, it is in the creditors' best interest to vote for the Plan since a liquidation would clearly result in creditors being paid less, if anything, upon liquidation other than set forth in the Plan. A Liquidation Analysis accompanies this Disclosure Statement as Exhibit "E."

## ARTICLE IX

## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Debtor believes that the Plan satisfies all of the requirements for confirmation.

## A.    General Confirmation Requirements

Section 1129(a) of the Bankruptcy Code requires that a plan be proposed in good faith, that there be disclosed certain information regarding payment made or promised to be made to insiders, and that the plan comply with the applicable provisions of chapter 11. The Debtor believes that is has complied with these provisions. Section 1121(a) of the Bankruptcy Code also requires that at least one impaired class accept the plan and that confirmation of the plan will likely not be followed by the need for further financial reorganization. Classes 1, 2, 3 and 4 are impaired under the Plan. The Debtor believes that such classes will vote to accept the Plan and if not, that "cramdown" will be successful.

## B.    Best Interest Test

Each holder of a Claim or Interest in an impaired Class must either: (i) accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of the Effective Date of the Plan, that is not less than the value that the holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash paid under the Plan to each Class equals or exceeds the value that would be allocated to the holders in a liquidation under chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test requires the Bankruptcy Court to find the Plan provides each member of each impaired Class a recovery having a value at least equal to that which each such Class member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. As illustrated by the Liquidation Analysis, the Debtor believes that the Plan meets the Best Interests Test.

## C.    Classification of Claims and Interests

The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each equity holder's interest in a class with other claims and interests that are "substantially similar." The Debtor believes the Plan meets the classification requirements of the Code.

## D.    Confirmation Hearing

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on the confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made timely in writing, filed with the Bankruptcy Court and served upon the following parties:

Peter D. Russin, Esquire
Joshua W. Dobin, Esquire
James C. Moon, Esquire
Meland Russin & Budwick, P.A., Attorneys for the Debtor
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2385

### E.    Voting

Section 1129(a) of the Bankruptcy Code requires that each Class or Claims or Interests that is impaired under the Plan vote (subject to the "cramdown" exception described herein). A Class of Claims under the Plan accepts the Plan if the Plan is accepted by a class of creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote on the Plan. A Class of Interests accepts the Plan if the Plan is accepted by holders of Interests that hold at least two–thirds in amount of the Allowed Interests in the Class that actually vote on the Plan. Holders of Claims or Interests that fail to vote are not counted as either accepting or rejecting the Plan.

### F.    Financial Feasibility

The Bankruptcy Code requires that, in order to confirm a plan, the Court must find that confirmation of the plan is not likely to be followed by liquidation of the need for further financial reorganization of the Debtor ("*Feasibility Test*"). For a plan to meet the Feasibility Test, the Court must find that the Debtor's Estate and the Reorganized Debtor will possess the capital and other resources necessary to meet their respective obligations under the plan.

The Debtor believes that following confirmation of the Plan, the Debtor and the Reorganized Debtor will be able to perform their obligations under the Plan without the need for further liquidation or financial reorganization. The Debtor's authorized use of BB&T's Cash Collateral, i.e., the Debtor's Rental Income, will be more than adequate to fund the Plan.

## ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

### A.    Discharge

Commencing on the Effective Date, except as otherwise expressly provided, all holders of Claims shall be precluded forever from asserting against the Debtor's estate, the Debtor or its Assets, any other or further liabilities, liens, obligation, claims or equity interest, arising or existing prior to the Effective Date, that were or could have been the subject of any Claim, whether or not Allowed. As of the Effective Date, the Debtor shall be discharged, released from and shall hold the Assets received or retained by and pursuant to the Plan, free and clear of all liabilities, liens, claims and obligations or other claims of any nature against the Debtor or its Estate, except those duties and obligations created by the Plan.

### B.    General Injunction

In accordance with section 524 of the Bankruptcy Code, the discharge provided by this Article and section 1141 of the Bankruptcy Code, among other things, acts as a permanent injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims or Interests against the Debtor.

### C.    Savings Clause

If any article, section, terms and/or subdivision of the Plan is ruled by the Bankruptcy Court to be improper or ineffective, or, if the Debtor decides to unilaterally remove any article, section, subsection, term, and/or provision of the Plan at the Confirmation Hearing, the Plan shall proceed to confirmation and be confirmed without the article(s), section(s), subsection(s), term(s), and/or provision(s) found to be improper or ineffective and/or unilaterally removed by the Debtor at the Confirmation Hearing.

### D.    Stay

Unless otherwise provided herein, all injunctions or stays provided for in the chapter 11 Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of the final decree closing the chapter 11 Case.

### E.    Exculpation

Except as otherwise specifically provided in the Plan, the Debtor, its officers, directors, employees, representatives, attorneys, financial advisors, shareholders, stockholders, or agents, or affiliates, or any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an interest, or any other party in interest, or any of their respective officers, directors, shareholders, stockholders, employees, representatives, attorneys, financial advisors, or agents, or affiliates, or any of such parties' successors and assigns, for any act or omission in connection with, relating to, or arising out of, the chapter 11 Case, the pursuit of Confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## ARTICLE XI

## FINAL REPORT

At such time as all of the Distributions provided for under the Plan have been made, the Reorganized Debtor shall file a final accounting with the Bankruptcy Court, together with the Final Report, and shall seek entry of a final decree closing the chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

## ARTICLE XII

### RETENTION OF JURISDICTION

**A.     Exclusive Jurisdiction of Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, from and after the Effective Date the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising out of, arising in or related to, the chapter 11 Case to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

1.     interpret and enforce the provisions of the Plan and Confirmation Order;

2.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Administrative Claim or Priority Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim or Interest pursuant to the Plan, and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or Interest (to the extent permitted under applicable law);

3.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending before, on or after the Effective Date;

4.     hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, or filed or commenced on or after, the Effective Date, including proceedings with respect to the rights and claims of the Reorganized Debtor to recover property under chapter 5 of the Bankruptcy Code, to commence or prosecute any cause of action (including any avoidance action), to seek a determination of any tax liability of the Debtor or Estate under section 505 of the Bankruptcy Code, or otherwise to collect or recover on account of any claim or cause of action that the Reorganized Debtor may have;

5.     hear and determine all disputes concerning the conduct of the Reorganized Debtor;

6.     determine and resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract to which the Debtor is a party or with respect to which the Debtor or reorganized Debtor may be liable, and to hear, determine and, if necessary, liquidate any claims, including cure Claims, arising therefrom;

7.     ensure that all payments and performance due under the Plan and the Plan Documents are accomplished as provided herein, and resolve any issues relating to distributions to holders of Allowed Claims pursuant to the provisions of the Plan and the Plan Documents;

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

8.      construe, take any action and issue such orders consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all Plan documents, contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement, the Confirmation Order, for the maintenance of the integrity of the Plan and the Plan Documents;

9.      determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan), the Plan documents or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan, the Plan documents or the Confirmation Order, or any Person's rights arising under or obligations incurred in connection therewith;

10.     entertain, approve and confirm modifications of the Plan before, on or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or modify the Disclosure Statement, the Confirmation Order or any Plan document, contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency in any Court order, the Plan, the Disclosure Statement, the Confirmation Order or any Plan document, contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code, and the Plan;

11.     issue injunctions, enter, implement and enforce orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

12.     enter, implement and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13.     determine any other matters that may arise in connection with or relating to the Plan and Plan Documents, the Disclosure Statement, or the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan and Plan Documents, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

14.     hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

15.     continue to enforce the automatic stay, and any other applicable stays or injunctions, through the date of entry of the final decree closing the chapter 11 Case;

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

16.    hear and determine (A) disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order and/or Plan documents, or (B) issues presented or arising under the Plan, the Confirmation Order and the Plan documents, including disputes among holders of claims and arising under agreements, documents or instruments executed in connection with the Plan, the Confirmation Order and/or the Plan documents;

17.    shorten or extend, for cause, the time fixed for performance of any act or event under the Plan, the Confirmation Order and/or the Plan documents, on notice or ex parte, as the Bankruptcy Court shall determine to be appropriate;

18.    enter any order, including injunctions, necessary to enforce the title, rights and powers of the Disbursing Agent, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

19.    review any action taken or not taken by the Disbursing Agent, and to appoint a successor Disbursing Agent, if necessary;

20.    adjudicate any settlements pursuant to Bankruptcy Rule 9019, if required under the Plan and the Confirmation Order, and all other matters contained herein; and

21.    enter a final decree closing the chapter 11 Case or converting the chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtor, the Estate, the Reorganized Debtor or the chapter 11 Case, this Article XII shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter. Nothing in this Article XII shall constitute a waiver by the United States of its rights to assert that the Bankruptcy Court lacks jurisdiction over any matter set forth in this Article XII.

## ARTICLE XIII

### MISCELLANEOUS PROVISIONS

### A.    Binding Effect of Plan

The provisions of the Plan, Confirmation Order and Plan Documents shall be binding upon and inure to the benefit of the Debtor, the Estate, the Reorganized Debtor, any holder of any Claim or Interest treated herein or any Person named or referred to the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, as to the binding effect, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan or the Confirmation Order.

**B.      Withdrawal of the Plan**

The Debtor reserves the right, at any time prior to the substantial consummation (as that term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, to revoke or withdraw the Plan.  If the Plan is revoked or withdrawn or if the Confirmation Date does not occur, the Plan shall be null and void and have no force and effect.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or interests by or against the Debtor or any other Person, constitute an admission of any fact or legal conclusion by the Debtor or any other Person, or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

**C.      Modification of the Plan**

Debtor reserves the right, in accordance with Bankruptcy Code Section 1127, to amend or modify the Plan in any manner necessary prior to entry of the Confirmation Order.  After entry of the Confirmation Order, the Debtor may, in accordance with Bankruptcy Code: (1) amend or modify the Plan and documents related thereto in accordance with, and to the extent permitted by, section 1127(b) of Bankruptcy Code and Bankruptcy Rule 3019, or (2) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**D.      Business Days**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**E.      Severability of Plan Provisions**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**F.      Governing Law**   EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, INCLUDING, WITHOUT LIMITATION, THE PLAN

DOCUMENTS, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA OR THE UNITED STATES OF AMERICA.

  **G.**  **Notices**  Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) first class U.S. mail, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Peter D. Russin, Esquire
Joshua W. Dobin, Esquire
James C. Moon, Esquire
Meland Russin & Budwick, P.A.
200 South Biscayne Blvd., Suite 3000
Miami, FL 33131-2385

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

## ARTICLE XIV

### RECOMMENDATION

The Debtor recommends that Creditors carefully consider and review this Disclosure Statement and the Plan. The Debtor believes that the Plan provides Creditors with the greatest possible value that could be realized on their Claims. There are several alternatives to confirmation of the Plan including liquidation of the Debtor under chapter 7 of the Bankruptcy Code, in which event the Debtor believes that Creditors would receive less than they will under the Plan.

For the reasons set forth above, the Debtor believes that the Distributions to each impaired Class under the Plan will be greater than distributions that might be received under a chapter 7 liquidation. The Debtor recommends that each Creditor vote to accept the Plan.

Dated: June 21, 2011.

3900 Biscayne, LLC
a Florida limited liability company

By:    s/Nancy Karp
       Nancy Karp
       Its:  Managing Member

Efiled by:    s/ Peter D. Russin
              Peter D. Russin, Esquire
              Florida Bar No. 765902
              prussin@melandrussin.com
              MELAND RUSSIN & BUDWICK, P.A.
              3000 Southeast Financial Center
              200 South Biscayne Boulevard
              Miami, Florida 33131
              Telephone: (305) 358-6363
              Telecopy: (305) 358-1221

              *Attorneys for Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

3900 BISCAYNE, LLC,1                         Case No. 11-22948-AJC
                                             Chapter 11

         Debtor.
_____/

## DEBTOR'S PLAN OF REORGANIZATION

 3900 Biscayne, LLC (the *"Debtor"*), as Debtor-in-Possession under Chapter 11 of Title 11 of the United States Code, files its Plan of Reorganization (the *"Plan"*).

 Please address all inquiries concerning the Debtor, this Plan, the Disclosure Statement in support of the Plan, and voting to Debtor's Attorneys:

Peter D. Russin, Esquire
Joshua W. Dobin, Esquire
James C. Moon, Esquire
Meland Russin & Budwick, P.A.
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 358-6363

## ARTICLE I.
## DEFINITIONS

 **A.    Defined Terms:** The capitalized terms used in the plan shall have the meanings set forth in the numbered Paragraphs of this Article.

 1.    "Administrative Claim" shall mean a Claim for payment of costs or expenses of the Chapter 11 Case as specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including without limitation:

 (i)    the actual, necessary costs and expenses of preserving the Debtor's Estate and operating the businesses of the Debtor, incurred and paid in the ordinary course of business by the Debtor after the Petition Date;

---

1 The Debtor's current mailing address is 2915 Biscayne Blvd., Ste 200, Miami, FL 33137.   The last four digits of the Debtor's tax identification number are 5787.

**Exhibit A**

(ii)    claims under sections 330(a), 331 or 503 of the Bankruptcy Code for compensation for professional services rendered and reimbursement of expenses in the Chapter 11 Case, except for amounts already awarded and paid to professionals retained in Chapter 11 Case (*"Professional Fee Claims"*);

(iii)    any post-petition taxes;

(iv)    fees and charges assessed against the Debtor's Estate pursuant to Section 1930 of Title 28 the United States Code (*"U.S. Trustee Fees"*).

2.    "Allowed" when used with respect to a Claim (other than an Administrative Claim, Contested Claim or Disallowed Claim) shall mean, except as otherwise ordered by the Court, a Claim or that portion of a Claim:

(i)    which has been scheduled (other than Claims set forth in the Debtor's Schedules as contingent, unliquidated or disputed) or timely filed with the Court as to which no objection to the allowance thereof has been interposed within the period of time limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or Order of the Court, or

(ii)    as to which any objection has been determined by a Final Order of the Court allowing such Claim or portion thereof. Unless otherwise specified in the Plan or in the Final Order of the Bankruptcy Court allowing such Claim, "Allowed Claim" shall not include interest on the amount of such Claim from and after the Petition Date.

3.    "Allowed Administrative Claim" shall mean any Administrative Claim that is "Allowed" pursuant to the procedure set forth in the Plan.

4.    "Allowed [Class Designation] Claim or Allowed [Class Designation] Interest" shall mean an Allowed Claim or Allowed Interest in the Class specified.

5.    "Assets" shall mean all personal, tangible and intangible property of the Debtor, contracts and contract rights, presently existing, or hereafter acquired, or created at any time, wherever located, and by whomever held, together with the products and proceeds thereof.

6.    "Available Cash" shall mean the net proceeds from the Rental Income from the Debtor's Assets, including, without limitation recoveries from the prosecution of Third Party Litigation Claims.

7.    "BB&T" shall mean Branch Banking & Trust, the Debtor's alleged secured lender.

8.    "Ballot" shall mean the form or forms distributed to each holder of a Claim or an Impaired Claim or Interest on which the holder indicates acceptance or rejection of the Plan or any election for treatment of such Claim or Interest under the Plan.

9.    "Ballot Date" shall mean the date set by the Court by which all Ballots must be received.

10.     "Bankruptcy Code" or "Code" shall mean Title 11 of the United States Code, as in effect from time to time, as applicable to the Chapter 11 case.

11.     "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time as applicable to the Chapter 11 Case, including the Local Rules of the Court.

12.     "Business Day" shall mean any day except a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

13.     "Cash Collateral" shall mean the proceeds of the Secured Lender's collateral.

14.     "Cash Distribution" shall mean the cash and any cash equivalents ($US) to be distributed pursuant to the Plan to be derived solely from the proceeds of the Rental Income received by the Reorganized Debtor and possibly from any recoveries from Third Party Litigation Claims the Reorganized Debtor may pursue.

15.     "Chapter 11 Case" shall mean the Debtor's above-captioned Chapter 11 case.

16.     "Claim" shall have the meaning as defined in section 101(5) of the Bankruptcy Code, including, without limitation, any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, uncontested, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmeasured, contested, uncontested, secured or unsecured.

17.     "Claims Bar Date" shall mean the deadline for filing any proofs of claim or interest that was established in the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines [ECF No. 7] as September 19, 2011, or as modified pursuant to any Court order.

18.     "Class" shall mean a group of Claims or Interests as classified under the Plan.

19.     "Collateral" shall mean the security interest in the assets of the Debtor at the time of the execution of the Loan Documents or thereafter acquired.

20.     "Confirmation Date" shall mean the date upon which the Court shall enter the Confirmation Order.

21.     "Confirmation Hearing" shall mean the hearing held by the Court to consider confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such hearing may be continued from time to time.

22.     "Confirmation Order" shall mean an Order of the Court confirming the Plan in form mutually satisfactory to the Interested Parties.

23.    "Contested Claim" shall mean a Claim (or portion thereof) for which: (a) a proof of claim was or is deemed filed under applicable law or Order of the Court; and (b) any such timely and properly filed objection is not: (i) withdrawn or resolved by stipulation or (ii) determined in whole or part by a Final Order. For purposes of the Cash Distributions under the Plan, a Claim shall be considered a Contested Claim, in whole or in part, as applicable, before the time that an objection is filed, but only until the expiration of the time for filing objections to claims, if: (x) the amount or classification of the Claim specified in the proof of claim exceeds the amount of or differs in classification from any corresponding Claim scheduled by the Debtor in the Schedules; (y) any corresponding Claim scheduled by the Debtor is scheduled as disputed, contingent or unliquidated; or (z) no corresponding Claim is scheduled by the Debtor in the Schedules.

24.    "Court" shall mean the United States Bankruptcy Court for the Southern District of Florida (Miami Division), Judge A. Jay Cristol, United States Bankruptcy Judge, presiding, and any other Court that exercises jurisdiction over this Chapter 11 Case.

25.    "Debtor" shall mean 3900 Biscayne, LLC.

26.    "DIP Accounts" shall mean all of the Debtor-in-Possession accounts maintained by the Debtor.

27.    "Disbursing Agent" shall mean the entity designated in the Confirmation Order authorized to make distributions under the Plan.

28.    "Disclosure Statement" shall mean the accompanying Disclosure Statement required pursuant to section 1125 of the Bankruptcy Code with respect to the Plan.

29.    "Effective Date" shall mean a date, unless extended if necessary, the first business Day, fourteen (14) days after the entry of the Confirmation Order or the date on which the Confirmation Order becomes final and non-appealable, whichever is later.

30.    "Estate" shall mean the estate created in this Chapter 11 Case by Section 541 of the Bankruptcy Code.

31.    "Executory Contract Rejection Claims" shall mean any Claim arising from the rejection of an executory contract in accordance with Section 365 of the Bankruptcy Code.

32.    "Fee Application" shall mean an application under Section 330(a), 331 or 503 of the Bankruptcy Code for allowance of any Professional Fee Claim in accordance with Local Rule 2016.

33.     "Final Order" shall mean an Order of the Court to which: (a) the time to file an appeal, motion or petition for review or rehearing or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; (b) any appeal taken or petition for certiorari filed has been resolved with the highest Court to which the Order or judgment was appealed or from which review, rehearing or certiorari was sought; or (c) with respect to an appeal taken from the Confirmation Order, no stay has been obtained by the Effective Date.

34.     "Insider" shall have the meaning as defined in section 101(3) of the Bankruptcy Code.

35.     "Interested Parties" shall mean, collectively, the Debtor, creditors and any others who have an interest in the Bankruptcy Case.

36.     "Litigation Proceeds" shall mean cash derived from the Third Party Litigation Claims.

37.     "Loan Documents" shall mean Note A Loan Documents and Note B Loan Documents.

38.     "Miami Arts" shall mean Miami Arts, Inc., d/b/a Miami Arts Charter School, the Debtor's tenant.

39.     "Note A Loan Documents" shall mean:

- Promissory Note to Colonial Bank, N.A., in the original principal amount of $10,800,000;
- Loan Agreement dated July 2, 2007;
- Mortgage and Security Agreement dated July 2, 2007, executed by the Debtor, and recorded on July 3, 2007, in Official Records Book 25751 at Page 4473, of the Public Records of Miami-Dade County, Florida encumbering the real property described as:

> Legal: Tract A, of WLBW-TV STUDIO SITE, according to the Plat thereof as recorded in Plat Book 80, Page 44 of the Public Records of Miami-Dade County, Florida a/k/a 3900 Biscayne Blvd., Miami, FL 33137; and

- UCC-1 Financing Statement filed with the Florida Secured Transaction Register and assigned Document No. 200706064133.

40. "Note B Loan Documents" shall mean:

- Promissory Note to Colonial Bank, N.A., in the original principal amount of $675,000.00 which was subsequently modified by that certain Note Modification Agreement dated November 5, 2008; and
- Pledge Agreement dated July 2, 2007, executed by Nancy Karp.

41. "Petition Date" shall mean May 12, 2011, the date the Debtor's Voluntary Petition was filed.

42. "Plan" shall mean the Debtor's proposed Plan of Reorganization and the accompanying Disclosure Statement filed, either in its present form or as it may be amended or modified from time to time, in accordance with the provisions of the Bankruptcy Code and the terms hereof.

43. "Priority Claim" shall mean any Claim, if allowed, entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

44. "Professional Fee Claim" shall mean a Claim under Section 330(a), 331 or 503 of the Bankruptcy Code for compensation for professional services rendered and reimbursement of expenses in the Chapter 11 Case.

45. "Project" or "Property" shall mean the property located at 3900 Biscayne Boulevard, Miami, Florida 33137, formerly the studio site for WLBW and most recently WPLG Channel 10.

46. "Pro Rata Share" shall mean with reference to any distribution on account of any Allowed Claim or Allowed Interest in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim or Allowed Interest bears to the aggregate amount of all Allowed and Contested Claims or Interests of the same Class as determined by the Disbursing Agent or the Court.

47. "Record Date" shall be the Confirmation Date as the date used by the Court for determining the holders of Claims and Interests entitled to receive distributions under the Plan.

48. "Rental Income" shall mean the rental income generated by the Tenant.

49. "Reorganized Debtor" shall mean the successor entity to be formed pursuant to the Plan with Assets of the Debtor.

50. "Schedules" shall mean the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor, as required by Section 521 of the Bankruptcy Code and the Bankruptcy Rules.

51.     "Secured Claim" shall mean a Claim that is considered secured under Section 506(a) of the Bankruptcy Code by property of the Debtor's Estate.

52.     "Tenant" shall mean Miami Arts, Inc., d/b/a Miami Arts Charter School, the Debtor's tenant.

53.     "Third Party Litigation Claims" shall mean all preserved causes of action including, but not limited to, claims against the previous owner of the Property for environmental damages and exposure, all adversary proceedings and/or lawsuits pending in state or federal courts, whether or not such claims have been asserted or causes of action have been commenced as of the Effective Date, including, but not limited to, causes of action for subordination under Section 510 of the Bankruptcy Code; causes of action which are property of the estate under Section 541 of the Bankruptcy Code; causes of action relating to turnover, avoidance actions and voidable transfers under sections 542 through 550 of the Bankruptcy Code; claims of action under State law; causes of action under Federal law; causes of action under other applicable non-bankruptcy law owned or belonging to the Debtor as more specifically set forth herein.

54.     "Unsecured Claim" shall mean any Claim against the Debtor that is not an Administrative Claim, a Priority Claim or Secured Claim, but including, without limitation, the Claims arising from the rejection of executory contracts, excluding BB&T's general unsecured claim.

55.     "Unsecured Insider Claim" shall mean an Unsecured Claim by an Insider.

**B.      Other Terms:** The words "herein", "hereof", "hereto", "hereunder" and other words and terms of similar import and construction refer to the Plan as a whole and not to any particular Article, paragraph or clause contained in the Plan.  A reference to an "Article" refers to an Article of the Plan.  Any term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code, or the Disclosure Statement.  The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in construction of the Plan.

**C.      Exhibits and Tables:** All Exhibits and Tables to the Plan are incorporated by reference into and are made a part of the Plan as if set forth in full herein.

## ARTICLE II.
## TREATMENT OF ADMINISTRATIVE CLAIMS

### A.      Treatment of Administrative Claims and Operating Expenses

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims against the Debtor and ordinary course operating expenses will not be classified for purposes of voting or receiving distributions under the Plan.  All such Claims and operating expenses will be treated separately as unclassified Claims and obligations on the terms set forth in this Article IV.

## B.    Treatment of Administrative Claims

**Time for filing Administrative Claims:**  Failure to timely file and Administrative Claim, at a time and date set by the Court, will result in such claim being forever barred and discharged unless otherwise ordered by the Court.

**Time for Filing Professional Fee Claims:**  Each person who holds or asserts a Professional Fee Claim must file with the Court, at a time and date set by the Court, and serve on all parties required to receive notice a final Fee Application.  The failure to timely file a final Fee Application will result in the Professional Fee Claim being forever barred and discharged unless otherwise ordered by the Court.

**Allowance of Administrative Claims:**  An Administrative Claim properly filed will become an Allowed Administrative Claim if no objection is filed and the same is approved by the Court.  If an objection is timely filed, the Administrative Claim will become an Allowed Administrative Claim only to the extent allowed by an order or judgment of the Court, which order or judgment becomes a Final Order.  An Administrative Claim that is a Professional Fee Claim will become an Allowed Administrative Claim only after and to the extent that (i) a final Fee Application is properly filed, and (ii) a Final Order allowing such Professional Fee Claim is entered by the Court.

## C.    Classification of Claims and Interests

### 1.    Summary of Classes and Classification

The categories of Claims and Interests listed below classify Claims (except for Administrative Claims and Operating Expenses) and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan.  The claims against the Debtor shall be classified as specified below.  Consistent with Section 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and is classified in a different Class, to the extent the Claim or the Interest is within the description of that different class.

### CLASSES AND CLASSIFICATION

Class 1    Secured Claim of Miami Dade County Tax Collector
Class 2    Secured Claim of BB&T
Class 3    Unsecured Claim of BB&T
Class 4    General Unsecured Claims
Class 5    Equity

**D.      Treatment of Classified Claims and Interests in the Plan**

      **1.      Administrative Claims of the Debtors**

      **Professional fees:**   The Debtor employed, or will seek to employ, with Court approval, the following professionals who may be filing interim and final fee applications (unless otherwise indicated):

- Peter D. Russin, Esquire and the law firm of Meland Russin & Budwick, P.A. ("*MRB*"), as the Debtor's counsel.
- Sandy Horwitz, CPA and the accounting firm of Goldstein Shechter Koch as the Debtor's accountant.

      At this time the Debtor does not know the amount of attorneys' fees and costs that will ultimately be sought by the Debtor's attorneys, MRB or its accountant.  In addition to any allowed interim payments, the attorneys' fees and costs and other professional fees shall be paid in full on the Effective Date of the Plan or as otherwise agreed between the Debtor and each administrative claimant.  The proposed Cash Collateral Order submitted to the Court but not yet entered provides that "[t]he administrative priority for the 507(b) Claim granted hereunder shall be subordinate only to (i) fees payable pursuant to 28 U.S.C. §1930(a)(6); and (ii) the payment of accrued and unpaid professional fees and expenses allowed by the Court of the Debtor's counsel, Meland Russin & Budwick, P.A., after first applying any prepetition retainer received, awarded by the Court."   The Debtor reserves the right to seek to retain additional professionals, if required.

      **2.      United States Trustee Fees**

      The Debtor shall pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the Effective Date, for pre-confirmation periods. The Debtor shall further pay the U.S. Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Debtor, respectively, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code.  After the Confirmation Date, the Debtor shall file a quarterly Post-Confirmation Operating Report which shall include, among other things, all payments made under the Plan and payments made in the ordinary course of business.  The Post-Confirmation Operating Report shall be filed quarterly until the Court enters a Final Decree, dismisses the case, or converts the case to another chapter in bankruptcy.

      **3.      Approval of Administrative Claims**

      All Administrative Claims are subject to allowance by the Bankruptcy Court and its determination of the reasonableness of the amounts.  Any party in interest can object to any claim for administrative fees and expenses.

### 4.    Payment of Allowed Administrative Claims

The holders of Allowed Administrative Claims shall receive, on account of such claims, cash in the amount of such claims (i) on the later of the Effective date or within ten (10) days any such claims are determined to be Allowed or (ii) at the option of the Debtor, in accordance with the ordinary business terms of payment of such claims. Professionals employed at the expense of the estate of the Debtor and entities who may be entitled to reimbursement for the allowance of fees and expenses from the estate of the Debtor pursuant to §503(b) of the Bankruptcy Code, shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with the final order entered pursuant to §330 or §503 of the Bankruptcy Code.

### The Debtor's Classes of Creditors

### A.    Allowed Secured Claim of Miami-Dade County Tax Collector (Class 1):

Class 1 consists of the Allowed Secured Claim of The Miami-Dade County Tax Collector (the "MDCTC"), plus statutory interest, for unpaid real property taxes for 2009 (the "MDCTC Claim"). MDCTC filed Claim No. 1 in the amount of $240,741.34, plus 18% statutory interest. The MDCTC Claim has been successfully appealed by the Debtor and has been reduced to $175,532.28, and as set forth in a letter from the MDCTC dated May 26, 2011, is further discounted to $168,510.98 if paid in full by June 26, 2011. That discounted payoff amount is no longer available after June 26, 2011, after which the taxes owed will increase at the statutory rate of 18% per annum dating back from April 2010 until they are paid. In order to obtain those savings for the benefit of the estate and its creditors, the Debtor filed Debtor's Emergency Motion for Order Authorizing Debtor to Pay Prepetition Property Taxes for 2009 Tax Year [ECF No. 44], which remains pending. If the approval to pay the discounted amount by June 26, 2011 is granted, the MDCTC claim shall be paid in full and will not constitute a claim in this case. In the event approval is denied, the MDCTC's Class 1 Claim will remain and will be paid within five (5) years of the 2009 assessment date. In that event, MDCTC's Class 1 Claim is impaired under the Plan.

### B.    Allowed Secured Claim of BB&T (Class 2):

Class 2 consists of the Allowed Secured Claim of BB&T, to be determined by a final, non-appealable order in this Bankruptcy Proceeding or an Adversary Proceeding. BB&T's Class 2 Claim, arising out of the A Note, and as evidenced by the May 12, 2011 monthly statement provided by BB&T, consists of principal in the amount of $10,800,000, note rate interest at 2.49%, and to the extent applicable, late charges and fees, for a total amount of $11,029,286[1]. Once the amount of BB&T's allowed secured claim has been determined, BB&T shall be paid in

---

[1] This amount is calculated through an anticipated Confirmation date of September 12, 2011, by using the amount listed on the May 12, 2011 statement provided by BB&T, adding post-petition per diem interest, and subtracting the anticipated adequate protection payments.

full, including note rate interest as calculated by the "Two Year-Swap Rate", which shall mean the International Swaps and Derivatives Associates ("ISDA") 2-year mid-market per swap rate, which is a rate for a Fixed Rate Payer in return for receiving three (3) month's LIBOR, plus a margin of 2.06%, as set forth in the A Note, with a 25 year amortization and a 4 year balloon in accordance with and as set forth in the projections. The Note A Loan Documents, including all of the terms and conditions contained therein, to the extent not expressly modified herein, are adopted in full by the Debtor and the Reorganized Debtor, and shall remain in full force and effect. BB&T shall retain a lien securing its Allowed Class 2 Claim until such Allowed Class 2 Claim is paid in full. To the extent that the Debtor's Rental Income and the proceeds from the Third Party Litigation Claims are insufficient to pay the Allowed Class 2 Claim, any deficiency shall be treated as an Allowed Class 3 Claim, pursuant to the terms set forth in the Plan. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 2 Claim. Class 2 is impaired under the Plan.

### C.    Allowed BB&T General Unsecured Claim (Class 3):

Class 3 consists of the Allowed BB&T General Unsecured Claim, to be determined by a final, non-appealable order in this Bankruptcy Proceeding or an Adversary Proceeding. This Class 3 Claim arises out of the B Note in the original principal amount of $675,000, and a remaining balance, including fees and costs, of $634,880.96[2], and is disputed by the Debtor. BB&T is also seeking to recover on the B Note from non-debtor defendants and from several certificates of deposits allegedly pledged as collateral for the B Note by third parties, Nancy Karp and Tania Buskela, which these third parties dispute. Once the amount of the Class 3 Claim is determined, and to the extent a claim remains, BB&T's Class 3 Claim shall be paid in full, including note rate interest as calculated by the "Two Year-Swap Rate", which shall mean the International Swaps and Derivatives Associates ("ISDA") 2-year mid-market per swap rate, which is a rate for a Fixed Rate Payer in return for receiving three (3) month's LIBOR, plus a margin of 2.06%, as set forth in the B Note, with a 25 year amortization and a 4 year balloon in accordance with and as set forth in the projections. The Note B Loan Documents, including all of the terms and conditions contained therein, to the extent not expressly modified herein, are adopted in full by the Debtor and the Reorganized Debtor and shall remain in full force and effect. The Allowed Class 3 Claim shall only be paid after the Allowed Class 2 Claim has been paid in full. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 3 Claim. Class 3 is impaired under the Plan.

### D.    Allowed General Unsecured Claims (Class 4):

Class 4 consists of all of the Allowed General Unsecured Claims. All holders of Allowed General Unsecured Claims shall be paid from the Debtor's Rental Income and the proceeds of any Third Party Litigation Claims, in full, within 4 years from the Effective Date, simultaneous

---

[2] This amount is calculated through an anticipated Confirmation date of September 12, 2011, by adding post-petition per diem interest, and subtracting the anticipated adequate protection payments.

with Allowed Class 2 and 3 Claims, at 2.49% interest at a two (2) year amortization, except for KKAID, which has agreed to accept payments beginning April 2014. The Debtor reserves the right to object to, settle, compromise or adjust by mediation, arbitration or otherwise the Allowed Class 4 Claims. Class 4 Claims are impaired.

### E.    Equity Interests (Class 5):

Class 5 consists of all holders of allowed equity interests in the Debtor. All Class 5 Equity Interests shall revest in the Reorganized Debtor on the Effective Date. The holders of allowed equity interests shall retain their equity interests, including for the purpose of governing the Reorganized Debtor.

## ARTICLE V.
## ACCEPTANCE OR REJECTION OF THE PLAN

### A.    Voting Classes.

Unless otherwise ordered by the Court, each holder of an Allowed Claim in Classes 1,2,3 and 4 shall be entitled to vote to accept or reject the Plan and shall be required to return its Ballot on or prior to the Ballot Date. Any holder of a Contested Claim or Interest whose entire Claim or Interest is objected to by the Debtor or other person qualified to object prior to Ballot Date shall not have the right to vote to accept or reject the Plan until the Contested Claim or Interest is resolved unless the holder of such Contested Claim or Interest requests an order from the Court pursuant to applicable Bankruptcy Rules temporarily allowing such Contested Claim for voting purposes. Any Ballot received from any such holder of a Contested Claim or Interest shall not be considered in determining whether the Plan has been accepted by a particular impaired Class of Claims or Interests.

### B.    Acceptance by Impaired Classes.

An Impaired Class of Claims shall have accepted the Plan if (1) the holders (other than holders designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims voting in such Class vote to accept the Plan, and (2) more than one-half in number of the holders designated under section 1126(e) of the Bankruptcy Code of at least two-thirds of the amount of Allowed Claims.

### C.    Nonconsensual Confirmation (Cramdown).

The Debtor intends to request that the Court confirm the Plan in accordance with Section 1129(b) (the so-called "Cramdown" provisions) of the Bankruptcy Code if any Class or Claims or Interests votes not to accept or is deemed not to have accepted the Plan.

## ARTICLE VI.
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    Source and Application of Funds Upon Confirmation

The Plan is a plan of reorganization. The Debtor's principal sources of revenue are comprised of the Debtor's Rental Income and the proceeds of any Third Party Litigation Claims. Prior to the Effective Date, the Debtor, and following the Effective Date, the Reorganized Debtor shall (i) continue to collect its Rental Income and operate the Property, and (ii) shall prosecute the Third Party Litigation claims, if any.

### B.    Prosecution of Third Party Litigation Claims

As stated above, the Debtor's Plan will also be implemented through the prosecution of claims against third parties, if any. On the Effective Date, the Reorganized Debtor shall be authorized, except as provided for in the Plan, to commence and prosecute any and all Third Party Litigation Claims that arose before, on or after the Petition Date. Proceeds, if any, realized from any Third Party Litigation Claims shall be added to the Rental Income used to fund the Plan. The Debtor has a claim against Post-Newsweek, the prior owner of the Property, pursuant to the PSC and the settlement agreement between the Debtor and Post-Newsweek, for any unremediated environmental contamination and damage.

In addition, within ninety (90) days prior to the Petition Date, the Debtor made payments to creditors and other parties. A list of payments to Debtor's creditors within ninety days prior to the Petition Date is included in the Debtor's Statement of Financial Affairs. Many of the recipients of payments may have defenses to the Estate's causes of action and/or the pursuit of such claims may not be economically feasible due to the amount of the payments at issue. The Debtor is continuing its investigation of any and all Third Party Litigation Claims, including but not limited to preference claims, avoidance actions, and insider claims under bankruptcy law, which the Debtor may have against third parties, and specifically reserves all such claims.

### C.    Revesting of Assets

Except as otherwise provided in the Plan or Confirmation Order, title to all of the Debtor's Assets will revest in the Reorganized Debtor, free and clear of all claims and interests on the Effective Date. After the Effective Date the Reorganized Debtor may operate its respective property and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or Confirmation Order. As of the Effective Date, the Debtor's Estate will be free and clear of all claims and interest except as otherwise provided in the Plan or the Confirmation Order.

### D.    Post-Confirmation Operations

Following Confirmation, the Reorganized Debtor shall execute such documents and take such other actions as are necessary to make effective the transactions provided for in the Plan.

### E.    Post-Confirmation Accounts

The Debtor may establish one or more interest-bearing accounts as it determines may be necessary or appropriate to effectuate the provisions of the Plan consistent with the section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court.

### F.    Closing of the Chapter 11 Case

Notwithstanding anything to the contrary in the Bankruptcy Rules or Local Rules providing for earlier closure of the chapter 11 case, when all Contested Claims against the Debtor have become Allowed Claims or Disallowed Claims, and all remaining Assets of the Debtor have been liquidated and converted into Available Cash (other than those Assets abandoned by the Debtor), and such Available Cash has been distributed in accordance with the Plan, or at such earlier time as the Reorganized Debtor deems appropriate, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### ARTICLE VII.
### PROVISIONS FOR AND DISTRIBUTIONS IN RESPECT OF
### CONTESTED CLAIMS AND INTERESTS

### A.    Objections to Claims.

All objections to Claims shall be filed by the Debtor and served on the applicable claimant by the date established by the Court.    After the Confirmation Date, only the Reorganized Debtor shall have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to Claims, including, without limitation, any counterclaim, offset, recoupment or similar claim asserted against Debtor's Estate arising under or relating to or in connection with any of the claims or causes of action assigned to Reorganized Debtor.    This provision shall not preclude the Debtor from objecting to any Claim prior to the Confirmation Date for voting purposes.    If a Claim is objected to prior to the Confirmation Date, such claimant shall not have the right to vote to accept or reject the Plan until the objection is resolved, unless such claimant requests an order from the Court pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes only.

**B.     No Distributions Pending Allowances.**

Notwithstanding any other provisions of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

**C.     Withholding and Distribution in Respect of Contested Claims.**

      **1.     Contested Claims Reserve.**  The Disbursing Agent will withhold from the property that would otherwise be distributed to holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the Effective Date, and shall place such withheld property in a reserve (the "Contested Claims Reserve"), which thereafter will be retained and administered by the Reorganized Debtor.

      **2.     Distribution in Respect of Contested Claims.**  Payments and distributions to holders of Contested Claims to the extent that such Claims untimely become Allowed Claims, will be made from the Contested Claims Reserve and thereafter from the Reorganized Debtor in accordance with the provisions of this Plan governing the Class of Claims to which the respective Claim holder belongs.

      **3.     Distributions After Disallowance.**  If any of the property withheld in the Contested Claims Reserve remains after all objections to Contested Claims of a particular Class have been resolved, then such property will be retained and administered by the Reorganized Debtor to be distributed in accordance with the provisions of the Plan governing the Class of Claims to which the Disallowed Claims belong.

## ARTICLE VIII.
## DISTRIBUTION UNDER THE PLAN

**A.     Disbursing Agents.**

The Disbursing Agent designated in the Confirmation Order shall make all Cash Distributions pursuant to the Plan.

**B.     Investment of Cash.**

Cash Distributions to be held by the Disbursing Agent for distribution shall be invested by the Disbursing Agent in United States Treasury Bills, interest bearing certificates of deposit, interest bearing savings accounts and other investments permitted by Section 345 of the Bankruptcy Code or order of the Court, and the Disbursing Agent shall use its best efforts to maximize the rates of interest in light of liquidity requirements necessary to make Cash Distributions.  All interest earned on such Cash Distributions shall be held by the Disbursing Agent and thereafter transferred to the Reorganized Debtor.

C.      **Manner of Payment Under the Plan.**

Any Cash Distributions made by the Disbursing Agent pursuant to the Plan may be made, at the option of Disbursing Agent, either by check drawn on a domestic bank or by wire transfer from a domestic bank.

D.      **Setoffs and Recoupments.**

By so instructing the designated Disbursing Agent, the Debtor's Estate or Reorganized Debtor, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claim of any nature whatsoever that the Debtor's Estate or Reorganized Debtor may have against the holder of a Claim, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtor's Estate, or Reorganized Debtor of any such Claim or causes of action the Debtor's Estate or Reorganized Debtor may have against such holder.

E.      **Undeliverable Distributions.**

If the designated Disbursing Agent is unable to make cash Distributions to the holder of an Allowed Claim or Allowed Interest under the Plan for lack of a current address of the holder, if, after the passage of 180 days (from the Effective Date) and after any additional effort to locate the holder that the Court may direct, the payment or distribution and any further payment or distribution to the holder shall be transferred to the Reorganized Debtor and the Claim or Interest shall be deemed satisfied to the same extent as if payment or distribution had been made to the holder of the Claim or Interest.

F.      **Estimation.**

Prior to or subsequent to the Effective Date, in order to effectuate Cash Distributions pursuant to the Plan and to avoid undue delay in the administration of the Chapter 11 Case, the Debtor, or Reorganized Debtor, as the case may be, shall have the right to seek an order of the Court, pursuant to Section 502(c) of the Bankruptcy Code, after notice and a hearing (which notice may be limited to the holder of such Contested Claim or Interest and which hearing may be held on an expedited basis, if necessary), estimating or limiting the amount of the Cash Distribution that must be withheld from distributions on account of Contested Claims or Interests.

G.      **Other General Provisions Concerning Disbursing Agent.**

1.      **Exculpation of Disbursing Agent.**    From and after the Effective Date, the Disbursing Agent designated in the Confirmation Order shall be exculpated by all persons receiving distributions under the Plan from any and all Claims, causes of actions and other assertions of liability (including breach of fiduciary duty) arising out of the Disbursing Agent's discharge of the powers and duties conferred upon it by the Plan, the Confirmation Order or any

order of the Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the gross negligence or wilful misconduct of such Disbursing Agent. No holder of a Claim or an Interest shall pursue any Claim or case of action against the designated Disbursing Agent for making payments or distributions in accordance with the Plan or for implementing the provisions of the Plan. Nothing in this Paragraph shall be deemed to release or waive the right of a holder of an Allowed Claim or Interest to receive its distribution under the Plan.

        **2.**    **Power of Disbursing Agent.** The Disbursing Agent shall be empowered to take all steps and execute all instruments and documents necessary to effectuate or implement the Plan, make the Cash Distributions, comply with the Plan and the obligations hereunder and exercise such other powers as may be vested in the designated Disbursing Agent by the Confirmation Order or any other order of the Court, pursuant to the Plan, or as deemed by the designated Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

        **3.**    **Expense Incurred on or After the Effective Date.** Except as otherwise ordered by the Court or provided herein, the amount of any objectively reasonable fees and expenses incurred by the designated Disbursing Agent on or after the Effective Date (including taxes) and any compensation and expense reimbursement claims (including reasonable fees and expenses of counsel) made by a designated Disbursing Agent, may be paid by the Reorganized Debtor (on account of distributions of Interests) or the Debtor's Estate on account of Cash Distributions to holders of Allowed Claims without further Order of the Court.

## ARTICLE IX.
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

        **A.**    **Discharge.**

        **1.**    **Discharge.** Commencing on the Effective Date, except as otherwise expressly provided, all holders of Claims shall be precluded forever from asserting against the Debtor's Estate, the Reorganized Debtor or its respective assets, any other or further liabilities, liens, obligations, claims or equity interest, arising or existing prior to the Effective Date, that were or could have been the subject of any Claim whether or not Allowed. As of the Effective Date, the Reorganized Debtor shall be discharged, released from and shall hold all the assets received or retained by and pursuant to the Plan, free and clear of all liabilities, liens, claims and obligations or other claims of any nature against the Debtor or its Estate.

        **2.**    **Injunction– General.** In accordance with Section 524 of the Bankruptcy Code, the discharge provided by this section and Section 1141 of the Bankruptcy Code, among other things, acts as a permanent injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims or Interests against the Reorganized Debtor as discharged pursuant to the Plan.

**3.     Exculpation.** Except as otherwise specifically provided in the Plan, the Debtor, its officers, directors, employees, representatives, advisors, attorneys, financial advisors, or agents, or any of such parties' successors and assigns, 3900 Biscayne, LLC, Nancy Karp, or any scheduled equity security holder of 3900 Biscayne, LLC, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the chapter 11 Case, the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**4.     Savings Clause.** If any release or discharge of a non-Debtor entity hereunder is ruled by the Court to be improper or ineffective, the Plan shall proceed to confirmation and be confirmed without that part found to be improper or ineffective.

**5.     No Waiver of Causes of Action.** No provision of the Plan or the acceptance of any distributions hereunder shall compromise, settle or release any claims or causes of action belonging to the Debtor in respect of the Assets, including, but not limited to, claims or causes of action defined or identified herein or related to the Third Party Litigation Claims. Except as provided by the Confirmation Order, separate order of the Court, or separate agreement of the Interested Parties, Insiders and Affiliates of the Debtor, present and former Interest Holders (or control persons of such Interest Holders), directors, officers, agents, financial advisors, brokers and employees of the Debtor shall not be discharged or released from any claims or causes of action against them based on any Claim against or Interest in the Debtor or based on any act or omission, transaction or other activity or security instrument or other agreement of any kind existing prior to the Effective Date.

**B.     Retention and Assignment of Causes of Action by Debtor to the Reorganized Debtor – Prosecution of Third Party Litigation Claims.**

Debtor and the Debtor's Estate hereby assign, transfer, and convey all claims and causes of action of the Debtor, including the Third Party Litigation Claims, to the Reorganized Debtor, which shall retain and may pursue any such claims and causes of action of the Debtor's Estate so assigned.

The Debtor's Plan will also be implemented through the prosecution of claims against third parties, if any. On the Effective Date, the Reorganized Debtor shall be authorized, except as provided for in the Plan, to commence and prosecute any and all third party litigation claims that arose before, on or after the Petition Date. Proceeds, if any, realized from any third party litigation claims shall be added to Available Cash. The Third Party Litigation claims to be prosecuted may include an action against Post-Newsweek, the prior owner of the Property,

pursuant to the PSC and the settlement agreement between the Debtor and Post-Newsweek, for any unremediated environmental contamination and damage.

The Debtor reserves its right to prosecute claims against Colonial Bank, N.A. and BB&T, as successor, for all causes of action arising out of their involvement with the loan to the Debtor.

### Preference Claims, Avoidance Actions and Insider Claims

Within ninety (90) days prior to the Petition Date, the Debtor made payments to creditors and other parties. A list of payments to Debtor's creditors within ninety days prior to the Petition Date is included in the Debtor's Statement of Financial Affairs. Many of the recipients of payments may have defenses to the Estate's causes of action and/or the pursuit of such claims may not be economically feasible due to the amount of the payments at issue. The Debtor is continuing its investigation of any and all third party litigation claims, including but not limited to preference claims, avoidance actions, and insider claims under bankruptcy law, which the Debtor may have against third parties, and specifically reserves all such claims.

### ARTICLE X.
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, every executory contract and unexpired lease of the Debtor that has not specifically been assumed or rejected before the Confirmation Date with the approval of the Court or that a motion to assume or reject has not been filed at that time, will be rejected. At or prior to conclusion of the Confirmation Hearing (with appropriate notice to the affected parties), the Debtor may identify any other executory contracts or unexpired leases they may assume or reject effective as of the Effective Date. The Reorganized Debtor shall be bound by those executory contracts and unexpired leases assumed pursuant hereto and (pursuant to Section 365(k) of the Bankruptcy Code) the Debtor's Estate shall be relieved of any liability in connection with such executory contracts and unexpired leases upon assumption herein.

### ARTICLE XI.
### EFFECTIVENESS OF THE PLAN

#### A.    Conditions Precedent.

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full or waived in accordance with the provisions specified below:

#### i.    Entry of Confirmation Order.

The Court shall have entered the Confirmation Order confirming and approving the Plan in all respects by the Confirmation Date and the Confirmation Order shall become a Final Order.

ii.    **Waiver of Deadlines or Other Conditions.**

As contemplated by the definition of Confirmation Date and Effective Date herein, the deadlines set forth above may be extended (if necessary) with the mutual express consent of the Interested Parties or as may be necessary to reasonably accommodate the Court's calendar.

**B.    Default Remedies.**

If the Reorganized Debtor is unable to perform the terms and conditions of the Plan, then it will be in default. Remedies of Creditors are limited to claims against the Reorganized Debtor. Creditors may enforce their remedies in the same manner as they would otherwise pursue damages for breach of contract or other actions arising out of the Debtor's default.

## ARTICLE XII.
## ADMINISTRATIVE PROVISIONS

**A.    Retention of Jurisdiction.**

The Court shall retain jurisdiction over all matters arising in or related to the Chapter 11 Case and the Plan for the following purposes:

1.    To hear and determine pending motions for the assumption or rejection of the executory contracts or unexpired leases and disputed issues concerning termination of contracts, if any are ending, and the allowance of Claims resulting therefrom;

2.    To determine any and all pending adversary proceedings, contested matters, applications and unresolved motions;

3.    To hear and determine timely and proper objections to Claims and Interests filed both before and after the Confirmation Date by the Reorganized Debtor, including objections to the classification, estimation, establishment of priority or status of any Claim or Interest, and to allow or disallow any Contested Claim or Interest, in whole or in part, as contemplated in the Plan;

4.    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated, provided, however, this provision shall not form a jurisdictional basis for staying, revoking, modifying or vacating the Confirmation Order;

5.    To consider modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

6. To hear and determine all claims and causes of action to recover Assets of the Debtor or Reorganized Debtor wherever located, including any causes of action under applicable sections of the Bankruptcy Code;

7. To hear and determine all controversies arising in connection with the Plan and other matters provided for in the Confirmation Order;

8. To hear and determine all controversies arising in connection with the Third Party Litigation Claims, including motions to approve settlements among the Reorganized Debtor and third parties.

9. To hear and determine all administrative matters necessary to complete the distributions contemplated hereunder and enter a final decree closing the Chapter 11 case.

**B.    Payment of Statutory Fees; U.S. Trustee.**

The Debtor or the Reorganized Debtor, as the case may be, shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the Effective Date, for pre-confirmation periods. The Debtor or the Reorganized Debtor, as the case may be, shall further pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Debtor or the Reorganized Debtor, as the case may be, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code. After the Confirmation Date, the Debtor or the Reorganized Debtor, as the case may be, shall file a quarterly Post-Confirmation Operating Report which shall include, among other things, all payments made under the Plan and payments made in the ordinary course of business. The Post-Confirmation Operating Report shall be filed quarterly until the Court enters a Final Decree, dismisses the case, or converts the case to another chapter in bankruptcy.

**C.    Headings.**

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any purpose.

**D.    Binding Effect.**

The Plan shall be binding on and inure to the benefit of the Debtor, Reorganized Debtor, and all of the holders of Claims and Interests and their respective successors and assigns.

**E.      Modifications of Plan and Related Documents.**

Debtor reserves the right, in accordance with Bankruptcy Code Section 1127, to amend or modify the Plan in any manner necessary prior to entry of the Confirmation Order. After entry of the Confirmation Order, the Debtor may, in accordance with Bankruptcy Code: (1) amend or modify the Plan and documents related thereto in accordance with, and to the extent permitted by, section 1127(b) of Bankruptcy Code and Bankruptcy Rule 3019, or (2) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**F.      Filing or Execution of Additional Documents.**

On or before the Effective Date, the Debtor shall file with the Court or execute, as appropriate, such agreements and other documents in addition to the Exhibits as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, including without limitation, amendments to the Schedule of Assumed Contracts.

**G.      Withholding and Reporting Requirements.**

In connection with the Plan, and all instruments issued in connection therewith in distributions to be made, the Debtor's Estate and Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, foreign taxing authority, and all Cash Distributions hereunder shall be subject to any such withholding and reporting requirements.

**H.      Notices.**

All notices, requests and demands and other communications to the Debtor, including any objections to the Disclosure Statement, shall be in writing and shall be delivered in person or by courier, U.S. Mail (postage prepaid) or by facsimile transmission to:

3900 Biscayne, LLC                               With copies to:
Attn: Nancy Karp, Managing Member                Peter D. Russin, Esq.
2915 Biscayne Blvd., Ste 201                     Joshua W. Dobin, Esq.
Miami, FL 3317                                   James C. Moon, Esq.
                                                 Meland Russin & Budwick, P.A.
                                                 3000 Southeast Financial Center
                                                 200 South Biscayne Boulevard
                                                 Miami, Florida 33131

## ARTICLE XIII.
## RECOMMENDATION

The Debtor recommends that its creditors carefully consider and review the Disclosure

Statement and the Plan of Reorganization and vote to accept the Plan of Reorganization.

Dated: June 21, 2011.

3900 Biscayne, LLC
a Florida limited liability company

By:    s/Nancy Karp
Nancy Karp
Its:  Managing Member

Efiled by:     s/ Peter D. Russin
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Debtor in Possession*



**FINANCE DEPARTMENT/TAX COLLECTOR'S OFFICE**
AD VALOREM TAX SECTION
140 W. FLAGLER STREET ● SUITE 1403
MIAMI, FLORIDA 33130-1575

Agenda Coordination
Art in Public Places
Audit and Management Services
Aviation
Building Code Compliance
Building
Business Development
Capital Improvements
Commission on Ethics and Public Trust
Communications
Community Action Agency
Community and Economic Development
Community Relations
Consumer Services
Corrections and Rehabilitation
County Attorney
Cultural Affairs
Technology Services
Elections
Employee Relations
Environmental Resources Management
Finance
Fire Rescue
General Services Administration
Homeless Trust
Housing Agency
Housing Finance Authority
Human Services
Independent Review Panel
International Trade Consortium
Juvenile Assessment Center
Libraries
Medical Examiner
Metropolitan Planning Organization
Office of Emergency Management
Office of Fair Employment Practices
Park and Recreation
Planning and Zoning
Police
Procurement
Property Appraiser
Public Works
Safe Neighborhood Parks
Seaport
Solid Waste Management
Strategic Business Management
Team Metro
Transit
Vizcaya Museum and Gardens
Water and Sewer

miamidade.gov

May 26, 2011

3900 Biscayne LLC.
2915 Biscayne Blvd. Suite. 200
Miami, FL 33137

Folio number    01 3219 026 0010

Corrected **2009** tax year

Dear Taxpayer:

The property Appraiser has ordered a correction in the assessment of the
referenced property for the following reason:  Value Change. (total)

C/O # 4565

To take advantage of the 4% discount, payment of **$168,510.98** must be in
our office by **June 26, 2011.**  After which payment amount is calculated at
18% from April 1st 2010 to the date of the payment.

Make checks payable in US funds drawn on US banks to: **Miami-Dade Tax
Collector.**

By: 

Jackie  M. Velazquez
**Tax Collector's Office**

*Delivering Excellence Every Day*

Exhibit B

```
TXM0111       * *  REAL ESTATE DELINQUENT TAX SYSTEM   * *   CURR DATE   05/26/2011
                   CERTIFICATE GROSS BREAKDOWN INQUIRY        AS OF DATE  05/24/2011
                                                             SALE DATE   04/01/2010
ERT 2009 00057351  TYPE 05   FOLIO 01 32190260010             PURCHASE    00/00/0000
TATUS   OPEN                  TAXDEED #       00000
UYER 000100    INT 18.00                      *------B R E A K D O W N------*
               MILL 0100                      *
ACE VALUE           175532.28 COLL M/Y 11/2009  *   GROSS TAXES        175532.28
ONEX           0                              *   SALE INTEREST           0.00
UTHORITY    MARCH AMT   AUTHORITY    MARCH AMT *   5 PERC COMM            0.00
CH OP       58770.08                          *   ADVERTISE FEE          0.00
CH DEBT      2267.43                          *   COST OF SALE           0.00
IND           263.39                          *   SALE FACE VAL      175532.28
M DIST       4081.38                          *   PART PAYMENT           0.00
VG PRJ        682.52                          *   INT SALE-PUR           0.00
HILD TR      3817.23                          *   PURCHASE FEE           0.00
NTY WD      36934.76                          *   PUR FACE VAL           0.00
BT SVC       2175.82                          *   PART PAYMENT           0.00
IBRARY       2917.89                          *   INT COLL M/Y           0.00
PER         58586.85                          *   REDEMPTION FEE         0.00
BT SVC       5034.93                          *   RET CK FEE             0.00
                                              *   TOTAL AMT DUE      168510.98

F1=MENU,CLEAR=PREVIOUS SCREEN
```



# Business Loan Statement



```
5042 4140161  001-05-02-10
3900 BISCAYNE LLC
3900 BISCAYNE LLC
C/O KOBI KARP ARCHITECTS
2915 BISCAYNE BLVD. STE 200
MIAMI              FL 33137
```

Statement Date: 05/12/2011                                                          Page 1 of 2

## Loan Summary

| | |
|---|---|
| Account Number | 9661423916-00001 |
| Current Loan Amount | $10,800,000.00 |
| Current Principal Balance | $10,800,000.00 |
| Interest Rate | 2.49000% |
| Daily Interest Charge | $747.0000 |
| Interest Paid YTD | $0.00 |
| Maturity Date | 05/05/2010 |

## Billing Summary

| | |
|---|---|
| Payment Due Date | 05/12/2011 |
| Current Principal Due | $0.00 |
| Current Interest Due | $0.00 |
| Current Late Fees Due | $300.00 |
| Current Other Fees Due | $14,615.56 |
| Past Due Date | 05/05/2010 |
| Past Due Amount | $214,371.00 |
| Total Amount Due | $11,029,286.56 |

### Maturity Statement

Equal Housing Lender 🏠                                          Member FDIC

## Transaction History

| Date | Description | Principal | Interest | Fees | Interest Rate | Principal Balance |
|---|---|---|---|---|---|---|
| | CURRENT RATE | | | | 2.49 | |
| 05/12/11 | ASSESSED ATTORNEY/TITLE INSUR/OTHER MISC FEE | | | 8,845.02 | | |

Detach here and mail with your payment in the enclosed envelope. Make check payable to BB&T. Be sure to include your loan account number on the check. Allow 7 days for postal delivery.

| Customer | Note | TC | Statement Date | Payment Due Date |
|---|---|---|---|---|
| 9661423916 | 00001 | 90 | 05/12/2011 | 05/12/2011 |

1029661423916000015000110292865605O3

*PAYMENT VOUCHER*

3900 BISCAYNE LLC

Total Amount Due: $11,029,286.56

Amount Enclosed        $                    •

☐  *Check here if you prefer to have your payment drafted.*

BB&T ITEM PROCESSING CENTER
PO BOX 580050
CHARLOTTE NC 28258-0050

⑈⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊⑊

‖'0000 1'' ⑈:5260 2222⑈: 9661423916'' 90                **Exhibit C**

*Helpful Information:*

*For questions regarding this bill, or to pay your account off in full, please contact your local BB&T account officer.*

*Only Checks or Money Orders should be sent by Mail.*

*This statement does not reflect activity after statement date.*

*Payments can be accepted at teller windows of any branch.  If payment is received by 2:00 P.M., it will be credited to your account the same day.  If received after 2:00 P.M., it will be credited as of the following business day.*

*Messages:*

Member FDIC

*Automatic Payment Authorization*                                                    *9661423916-00001*

By signing below, you authorize BB&T to automatically debit the checking or savings account listed below for the amount of your loan payment each month. This authorization will remain in place until we receive written notice from you to cancel your automatic payments for this loan.

Checking or Savings Account Number to Draft _____   Check One:   ☐ Checking  ☐ Savings

Financial Institution to Draft _____   Financial Institution's Transit Routing Number _____

Date _____   Signature of Account Holder_____

**Include a blank voided check (for checking accounts) or a voided deposit slip (for savings accounts).**

## PLAN PROJECTIONS
### 3900 BISCAYNE, LLC

| | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 |
|---|---|---|---|---|---|---|---|---|---|
| Wells Fargo DIP Operating Account | $ 318,650.19 | $ 297,016.44 | $ 165,357.96 | $ 176,380.12 | $ 189,027.28 | $ 193,985.38 | $ 197,318.48 | $ 202,276.58 | $ 207,234.68 |
| **REVENUE:** | | | | | | | | | |
| Miami Arts Charter School Rent | $ 66,250.00 | $ 66,250.00 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 |
| **TOTAL REVENUE** | $ 66,250.00 | $ 66,250.00 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 |
| **MONTHLY PAYMENTS:** | | | | | | | | | |
| Management Fee (3%) | $ 1,093.75 | $ 1,987.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 |
| Operating/Repair/Maintenance | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| **ONE TIME PAYMENTS:** | | | | | | | | | |
| Phase II Tenant Build-Out ($550,000 in total) | $ - | $ - | $ 27,500.00 | $ 27,500.00 | $ - | $ - | $ - | $ - | $ - |
| **PLAN/ADEQUATE PROTECTION PAYMENTS:** | | | | | | | | | |
| U.S. Trustee Fees | $ - | $ 1,625.00 | $ 1,625.00 | $ - | $ - | $ 1,625.00 | $ - | $ - | $ 1,625.00 |
| 2009 Property Taxes ($168,510.98 discount amount if paid/received by June 26, 2011) | $ 168,510.98 | $ 168,510.98 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| BB&T - A Note ($511,023,286 + 2.49% interest with 0.25% interest rate increase each year at 25 year amortization with 4 year balloon) | $ 14,940.00 | $ 22,410.00 | $ 23,157.00 | $ 23,157.00 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 |
| BB&T - B Note ($634,880.96 + $2.49% interest with 0.75% interest rate increase each year 25 year amortization with 4 year balloon) | $ - | $ - | $ - | $ - | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 |
| Comras ($138,500 plus 2.49% interest at 2 year amortization) | $ - | $ - | $ - | $ - | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 |
| Dade County Tax Advisor LLC ($1,832.42 plus 2.49% interest at 2 year amortization) | $ - | $ - | $ - | $ - | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 |
| DC Media Graphics ($1,808.30 plus 2.49% interest at 2 year amortization) | $ - | $ - | $ - | $ - | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 |
| KXAD ($1,056,315.40 plus 2.49% interest commencing in Apr 2014 by agreement) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **TOTAL BILLS TO PAY** | $ 21,033.75 | $ 197,908.48 | $ 59,394.50 | $ 57,769.50 | $ 65,458.56 | $ 67,083.56 | $ 65,458.56 | $ 65,458.56 | $ 67,083.56 |
| **NET REVENUE** | $ (21,033.75) | $ (131,658.48) | $ 11,022.16 | $ 12,647.16 | $ 4,958.10 | $ 3,333.10 | $ 4,958.10 | $ 4,958.10 | $ 3,333.10 |

**Exhibit D**

## PLAN PROJECTIONS
### 3900 BISCAYNE, LLC

| | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ 210,567.78 | $ 215,525.88 | $ 220,483.98 | $ 223,817.08 | $ 228,775.18 | $ 233,733.28 | $ 242,733.05 | $ 251,722.82 | $ 260,822.65 | $ 269,912.48 | $ 275,002.31 | $ 288,692.14 | $ 297,181.97 |
| | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,423.70 | $ 49,338.55 | $ 49,338.55 | $ 49,338.55 | $ 49,338.55 | $ 49,338.55 | $ 49,338.55 |
| | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 |
| | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 70,416.66 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 | $ 74,583.33 |
| | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,112.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 | $ 2,237.50 |
| | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| | | | $ 1,625.00 | | | | | | | | | | |
| | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,844.99 | $ 2,840.08 | $ 2,840.08 | $ 2,840.08 | $ 2,840.08 | $ 2,840.08 | $ 2,840.08 |
| | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 | $ 5,921.70 |
| | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 | $ 78.35 |
| | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 | $ 77.32 |
| | $ 4,958.10 | $ 4,958.10 | $ 3,333.10 | $ 4,958.10 | $ 4,958.10 | $ 8,999.77 | $ 8,999.77 | $ 9,089.83 | $ 9,089.83 | $ 9,089.83 | $ 9,089.83 | $ 9,089.83 | $ 9,089.83 |
| | $ 65,458.56 | $ 65,458.56 | $ 67,083.56 | $ 65,458.56 | $ 65,458.56 | $ 65,583.56 | $ 65,583.56 | $ 65,493.50 | $ 65,493.50 | $ 65,493.50 | $ 65,493.50 | $ 65,493.50 | |
| | $ 65,458.56 | $ 65,458.56 | | | | | | | | | | | |

**PLAN PROJECTIONS**
**3900 BISCAYNE, LLC**

| | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | 306,273.80 | 315,561.63 | 324,451.46 | 333,541.29 | 342,631.12 | 351,720.95 | 360,810.78 | 376,033.35 | 391,255.92 | 406,478.49 | 421,701.06 | 436,923.63 | 452,146.20 | 467,368.77 |
| $ | 49,338.55 | 49,338.55 | 49,338.55 | 49,338.55 | 49,338.55 | 49,338.55 | 49,286.19 | 49,286.19 | 49,286.19 | 49,286.19 | 49,286.19 | 49,286.19 | 49,286.19 | 49,286.19 |
| $ | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 |
| $ | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 | 74,583.33 |
| $ | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 45,078.29 |
| $ | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | |
| $ | 2,840.08 | 2,840.08 | 2,840.08 | 2,840.08 | 2,840.08 | 2,840.08 | 2,837.07 | 2,837.07 | 2,837.07 | 2,837.07 | 2,837.07 | 2,837.07 | 2,837.07 | 2,837.07 |
| $ | 5,921.70 | 5,921.70 | 5,921.70 | 5,921.70 | 5,921.70 | 5,921.70 | | | | | | | | |
| $ | 78.35 | 78.35 | 78.35 | 78.35 | 78.35 | 78.35 | | | | | | | | |
| $ | 77.32 | 77.32 | 77.32 | 77.32 | 77.32 | 77.32 | 77.32 | | | | | | | |
| $ | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | 2,237.50 | | | | | | | | |
| $ | 65,493.50 | 65,493.50 | 65,493.50 | 65,493.50 | 65,493.50 | 65,493.50 | 59,360.76 | 59,360.76 | 59,360.76 | 59,360.76 | 59,360.76 | 59,360.76 | 59,360.76 | 59,360.76 |
| $ | 9,089.83 | 9,089.83 | 9,089.83 | 9,089.83 | 9,089.83 | 9,089.83 | 15,222.57 | 15,222.57 | 15,222.57 | 15,222.57 | 15,222.57 | 15,222.57 | 15,222.57 | 15,222.57 |
| $ | | | | | | | | | | | | | | 104,439.05 |
| $ | | | | | | | | | | | | | | (29,855.72) |

## PLAN PROJECTIONS
### 3900 BISCAYNE, LLC

| | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 437,513.05 | $ 407,657.33 | $ 377,801.61 | $ 356,029.23 | $ 334,256.84 | $ 312,506.46 | $ 290,756.08 | $ 265,005.70 | $ 247,255.32 | $ 225,504.94 | $ 203,754.56 | $ 182,004.18 | $ 160,253.80 | $ 138,503.42 | $ 116,753.04 | $ 95,002.66 | $ 73,252.28 |
| $ 74,583.33 | $ 74,583.33 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 |
| $ 74,583.33 | $ 74,583.33 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 | $ 82,916.66 |
| $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| $ 2,237.50 | $ 2,237.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 | $ 2,487.50 |
| $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 | $ 45,078.29 |
| $ 2,837.07 | $ 2,837.07 | $ 2,837.07 | $ 2,837.07 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,835.87 | $ 2,856.43 |
| $ 49,286.19 | $ 49,286.19 | $ 49,286.19 | $ 49,286.19 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,265.38 | $ 49,274.98 |
| $ 104,439.05 | $ 104,689.05 | $ 104,689.05 | $ 104,689.05 | $ 104,687.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,687.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,667.04 | $ 104,677.20 |
| $ (29,855.72) | $ (29,855.72) | $ (21,772.39) | $ (21,772.39) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,750.38) | $ (21,760.54) |

## SUMMARY OF FEASIBILITY AND LIQUIDATION ANALYSIS

| Assets | | Reorg. Value | | Liquid. Value |
|---|---|---|---|---|
| Real Property and related assets (Note 1) | $ | 13,500,000.00 | $ | 7,875,000.00 |
| Less: commissions upon sale (Note 2) | $ | 0.00 | $ | (472,500.00) |
| Third Party Litigation Claims Recovery (unknown) | $ | 0.00 | $ | 0.00 |
| **Total Assets Available** | $ | **13,500,000.00** | $ | **7,402,500.00** |

| Liabilities | | Reorg. Value | | Liquid. Value |
|---|---|---|---|---|
| Administrative Expense Claims:                (Note 3) | $ | 300,000.00 | $ | 300,000.00 |
| Class 1: Miami-Dade County Tax Collector  (Note 4) | $ | 175,532.28 | $ | 175,532.28 |
| Class 2: Allowed Secured Claim of BB&T | $ | 11,029,286.00 | $ | 11,029,286.00 |
| Class 3:Unsecured Claim of BB&T | $ | 634,880.96 | $ | 634,880.96 |
| Class 4: Allowed Non BB&T General Unsecured Claims | $ | 1,196,456.10 | $ | 1,196,456.10 |
| Class 5: Equity Interests | $ | 0.00 | $ | 0.00 |
| Chapter 7 Trustee Expenses (Note 5) | $ | 0.00 | $ | 295,325.00 |
| **Total Liabilities** | $ | **13,336,155.34** | $ | **13,631,480.34** |
| **Total Assets** | $ | **13,500,000.00** | $ | **7,402,500.00** |
| **Total Liabilities** | $ | **13,336,155.34** | $ | **13,631,480.34** |
| | $ | 163,844.66 | $ | (6,228,980.34) |

Exhibit E

## Purpose of Liquidation Analysis

This liquidation analysis (the "Analysis") was prepared solely for the inclusion in the Disclosure Statement in compliance with the United States Bankruptcy Code. The Analysis involves estimating the proceeds that are expected to be generated in the liquidation of the assets of the Estate and reducing such amount by the secured claim, costs of liquidation, post-confirmation administrative claims, administrative expenses and priority claims, to arrive at estimated net proceeds available for distribution to unsecured creditors. The Analysis is based on the assumptions discussed in the notes below.

## Estimates of Liquidation Value

The Analysis is an estimate of the proceeds that the Debtor believes will be generated as a result of the liquidation of its Assets on June 21, 2011 (the "Analysis Date") and is based on the information available as of the date thereof. The information presented is not prepared in accordance with generally accepted accounting principles and has not been subject to any compilation, review or audit procedures by an independent accounting firm. No independent evaluation or appraisal of the Assets has occurred. The various estimates of value presented in this Analysis apply to this purpose only and may not be used out of the context presented herein.

Principally, values are based on financial information included in the Disclosure Statement, the petition for relief, bankruptcy schedules and statement of financial affairs (the "Schedules"), the Debtor's independent evaluation of its financial condition, the Debtor's monthly financial reports filed with the Bankruptcy Court, certain of the Debtor's financial records and pleadings and other filings with the Bankruptcy Court.

The estimates of liquidation value do not purport to reflect appraisals, or necessarily reflect the actual market value which may be realized if assets are sold. The Analysis is premised on various estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies that are difficult to predict and are beyond the control of the Debtor. The validity of the assumptions may be affected by the occurrence of events or the existence of conditions not now contemplated or by other factors, and there can be no assurance that the assumptions and estimates employed in determining the liquidation value of the Assets will result in an accurate estimate of the proceeds that would be realized in an actual liquidation. Additional information may become available after the date of this Analysis that could result in materially different values for certain assets and liabilities. Consequently, the estimates of value presented herein should not be regarded as a representation or warranty that the estimated liquidation values will be realized and actual liquidation values of the Assets could vary.

**Reservation of Rights**

The Debtor reserves all of its rights in connection with the estimated values of recoveries as set forth herein and the ability to pursue additional claims and causes of action and objections to claims. This analysis shall not be deemed a waiver of or estoppel in connection with such rights.

**NOTES**

Note 1:     For Reorganization Value, this value is an estimated value, subject to an appraisal.

For Liquidation Value, this value is an estimated value calculated based on the sale of the property as a distressed sale, subject to an appraisal.

Note 2:     For Reorganization Value, no sale is contemplated at this time.

For Liquidation Value, the calculation is based on a 6% commission on the sale of the asset at a distressed sale.

Note 3:     Expenses consist of the anticipated fees and costs of the Debtor's professionals through the Effective Date of the Plan, including U.S. Trustee fees.

Note 4:     This amount is based on the reduction of the 2009 taxes as set forth in the May 26, 2011 letter from the Miami-Dade Tax Collector. If paid by June 26, 2011, this amount can be further discounted to $168,510.98, but if not, will increase by 18% per annum dating back to April 2010 until paid. The Debtor is seeking approval to pay this claim by June 26, 2011 in order to take advantage of the discount.

Note 5:     This amount is comprised of the Chapter 7 Trustee's statutory fee formula under section 326 of the Bankruptcy Code and is calculated based on the expected disbursements in a Chapter 7 case, as well as an additional estimated $50,000.00 for the administrative professional fees of the Chapter 7 trustee.